Tony Dewayne CRAYTON, Appellant

v.

The STATE of Texas, Appellee

No. 06–14–00208–CR

Court of Appeals of Texas,
Texarkana.

Date Submitted: November 3, 2015

Date Decided: January 27, 2016

Martin E. Braddy, Attorney at Law, Sulphur Springs, TX, for appellant

William W. Ramsay, Delta, Franklin, Hopkins County District Attorney, Sulphur Springs, TX, for appellee

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Moseley

Tony Dewayne Crayton waived his right to a jury trial and entered a plea of not guilty at his bench trial. The trial court found Crayton guilty and sentenced him to fifty years' imprisonment. On appeal, Crayton maintains that the trial court erred (1) when it took judicial notice of its own file and reviewed a competency evaluation during its deliberations, and (2) when it denied his motions to suppress evidence. For the reasons below, we affirm the trial court's judgment.

## I. Background

After a 9-1-1 emergency operator received a call October 22, 2013, from the telephone at Jessica Tyler Crayton's mother's home on Morris Drive in Sulphur Springs, Texas, wherein no one spoke, Sulphur Springs police officers were dispatched to the place of origin of the call to investigate. Upon entry into the residence, the officers discovered the bloody and lifeless body of Jessica (who resided in the house with her mother, Crayton, and others), who had suffered multiple stab wounds. Approximately an hour after the officers arrived at the Morris Drive scene, officers were dispatched to the site of Sulphur Springs' League Street overpass of Interstate Highway 30. Upon their arrival there, officers found Crayton lying in the westbound lane of the interstate. It appeared to the investigating officers that Crayton had jumped or fallen from the overpass onto the interstate. Although Crayton appeared to be conscious, he was unable to speak. While some of the officers assumed the task of managing the traffic flow on the interstate and while medical personnel were assisting Crayton, other officers took possession of his shoes, his cap, and a pair of glasses which were located on the ground near him and which had what appeared to be blood on them. In addition to assuming control over these belongings, an officer took photographs of Crayton, including photographs of a cut on

Crayton's hand and of his tennis shoes, both of which having what appeared to be blood on them.

Emergency personnel transported Crayton by ambulance to the hospital in Sulphur Springs. While Crayton was at that hospital, one of the officers took possession of his clothing. Meanwhile, other Sulphur Springs officers were attempting to obtain a search warrant for Crayton's "person," the purpose of which was to assist them in Jessica's murder investigation. During the time the officers were working to obtain the search warrant, Crayton was transported by helicopter to another hospital in nearby Tyler, Smith County. Undaunted by Crayton's removal outside the county, upon learning of Crayton's relocation, the Sulphur Springs officers carried the search warrant they had obtained to the hospital in Tyler to execute it "on the person of Tony Crayton." Using the search warrant as their authority, the detectives retrieved blood, oral swabs, and fingernail clippings from Crayton. Crayton was charged with Jessica's murder while still hospitalized.

Crayton filed multiple pretrial motions to suppress the evidence arguing, among other things, that several items of his personal property and his person were taken without a warrant; he further argued that even though a search warrant was eventually obtained, the officers who executed the warrant were without jurisdiction to do so. The trial court denied Crayton's motions. Following a trial to the bench, the trial court found Crayton guilty of murder and sentenced him to fifty years' confinement in prison.

## II. Crayton's Points of Error

### A. The Trial Court Did Not Err When it Took Judicial Notice of its File

On September 15, 2014, the trial court issued an order appointing Dr. Michael Pittman to examine Crayton in regard to his competency to stand trial. On September 25, 2014, Pittman provided the trial court with his competency evaluation of Crayton, finding that he was competent to stand trial. Crayton contends that the trial court's action of taking judicial notice of the competency report issued by Pittman[1] (1) violated his Sixth Amendment right[2] to confront and cross-examine a witness under *Crawford*,[3] (2) violated Article 46B.007 of the Texas Code of Criminal Procedure,[4] and (3) violated Rule 201 of

---

1. Although Crayton repeatedly emphasizes that the trial court took judicial notice of the competency evaluation, the record shows that the trial court took judicial notice of the file in its entirety—not simply the competency evaluation contained therein. Crayton seems to be arguing that because the trial court took judicial notice of its file *and* reviewed the competency evaluation, it effectively took judicial notice of the evaluation on an independent basis. We note this distinction because in an appropriate situation, a court may take judicial notice of a single document in its file without taking judicial notice of the entire file.

2. The Sixth Amendment of the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right ...

to be confronted with the witnesses against him." U.S. Const. amend. VI.

3. *Crawford* held that the Confrontation Clause is a procedural guarantee which requires that "reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

4. Article 46B.007 of the Texas Code of Criminal Procedure states,

A statement made by a defendant during an examination or trial on the defendant's incompetency, the testimony of an expert based on that statement, and evidence obtained as a result of that statement may not be admitted in evidence against the defen-

the Texas Rules of Evidence.[5]

### 1. Analysis

 In order to effectively preserve a complaint for appellate review, a party must first present the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if those grounds are not apparent from the context. Tex.R.App. P. 33.1(a)(1). Further, the trial court must have either ruled on the request, objection, or motion, either expressly or implicitly, or, in the absence of a ruling, the complaining party must have objected to the trial court's refusal to rule. Tex.R.App. P. 33.1(a)(2). A "point of error on appeal must comport with the objection made at trial." *Wilson v. State,* 71 S.W.3d 346, 349 (Tex.Crim.App.2002); *see Swain v. State,* 181 S.W.3d 359, 367 (Tex.Crim.App.2005).

 An objection is timely if a party lodges a complaint as soon as the basis for it has become apparent. *Hollins v. State,* 805 S.W.2d 475, 476 (Tex.Crim.App.1991). The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial court of the basis of the objection and give it the opportunity to rule on it and (2) to give opposing counsel the opportunity to respond to the complaint. *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Crim.App.1977). As explained in *Resendez,*

> Although there are no technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to "let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."

*Resendez v. State,* 306 S.W.3d 308, 312–13 (Tex.Crim.App.2009) (quoting *Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App. 1992)). "The parties, not the judge, are responsible for the correct application of evidentiary rules," and "to preserve a complaint for appeal, the complaining party must have done everything necessary to bring the relevant evidentiary rule and its precise and proper application to the trial court's attention." *See id.* at 313.

Crayton agrees that in order to have preserved an issue for appeal, he was required to make an objection. In essence, Crayton tacitly concedes that he made no objection during the trial to the issue of the trial court having taken judicial notice of Pittman's report. He maintains that this was not necessary because (1) he was unable to lodge an objection prior to the trial court's announcement that it was taking judicial notice of the file (which contained Pittman's report); and (2) he timely raised the issue in his motion for new trial. Crayton contends that "[t]he requirement that an objection be raised in the trial court assumes that the appellant had the opportunity to raise it there." *Burt v. State,* 396 S.W.3d 574, 577 (Tex.Crim.App. 2013) (citing *Hardeman v. State,* 1 S.W.3d 689, 690 (Tex.Crim.App.1999); *Issa v. State,* 826 S.W.2d 159, 161 (Tex.Crim.App. 1992) (per curiam)). Crayton argues that

---

dant in any criminal proceeding, other than at:

 (1) a trial on the defendant's incompetency; or

 (2) any proceeding at which the defendant first introduces into evidence a statement, testimony, or evidence described by this article.

Tex.Code Crim. Proc. Ann. art. 46B.007 (West 2006).

**5.** Rule 201 of the Texas Rules of Evidence governs judicial notice of adjudicative facts. Tex.R. Evid. 201.

"if an appellant never had the opportunity to object, then he has not forfeited error." *Id.* at 577–78 (citing *Rickels v. State,* 108 S.W.3d 900, 902 (Tex.Crim.App.2003)).

In this case, Crayton takes the position that the trial court took judicial notice of the file and, therefore, reviewed Pittman's report outside of the parties' presence and during private deliberations. In other words, the trial court had already taken judicial notice of the file and the report before Crayton had an opportunity to object. Thus, he contends that he properly raised his objection for the first time in his motion for new trial. The State responds that Crayton's reliance on *Issa* is misplaced. The State maintains that unlike the circumstances of this case, the objectionable action in *Issa* was the last thing the trial court did before immediately leaving the bench, this being the reason that the defendant had no opportunity to object. *Issa v. State,* 826 S.W.2d 159, 160 (Tex.Crim.App.1992) (per curiam).

Here, the trial court gave a well-reasoned recounting of the method by which it arrived at its decision in this case. The trial court stated,

> Less than an hour and a half after the stabbing death, while we can't put an exact time of the stabbing death, we can really get within a few minutes of when that occurred. And we—we know generally when the 911 calls began to pour in reporting that a person had jumped from the League Street overpass onto Interstate 30. And that happened less than an hour and a half after the stabbing. Couple that with the last text sent from Tyler's [6] phone, thank you, at 12:46.
>
> We know that Sergeant Weatherford was dispatched or arrived on the scene, I should say, at 1:08 p.m. She would have been dispatched two to three minutes before that. And so you get a very small window of time of when it is that Jessica Tyler Crayton was stabbed to death.
>
> Sergeant Weatherford, importantly, was dispatched there because 911 received a phone call from that residence with no sound on the other end, nobody speaking on the other end. Couple that with when Mr. Crayton is discovered laying [sic] on Interstate 30, having, from the credible evidence, hurled himself onto the highway from the bridge above. There were on the shoes, his shoes laying [sic] next to his body, having come off from the violent fall—there was blood on his shoes, and forensics show that that blood belonged to the victim.
>
> Mr. Crayton's DNA was discovered on the knife handle, the knife that was determined to be the murder weapon. The victim's DNA was under Mr. Crayton's right-finger fingernail as that evidence was collected from him. At the time of his—tending to him on Interstate 30, there was a fresh slice cut wound on the webbing of his left hand. And we have the apparent suicide attempt.
>
> And what—the law says that reasonable inferences from testimony and exhibits can—can give—here's the instruction that I would give a jury, which I'm bound by: While I should consider only the evidence—and it is all I consider—I am permitted to draw inferences from the testimony and exhibits that are justified in the light of common experience. I may make deductions and reach conclusions that reason and common sense lead me to draw from the facts that have been established by the evidence.

6. The trial court referred to Jessica as "Jessica Tyler Crayton" and "Tyler."

And while these things that I've just listed—when he was seen, believed to be there, where he was found relative to the stabbing, when he was found relative to the stabbing, the circumstances, his blood on the—his DNA on the knife handle, DNA on other important forensic pieces of evidence, victim's DNA under his right fingernail, fresh cut wound on his hand, and the apparent suicide attempt, while circumstantial, a rational fact-finder, under the totality of the forensic evidence that came before the Court, could find that this individual, Tony Dewayne Crayton, was the individual who caused the death of Jessica Tyler Crayton by stabbing her with a knife.

And that's before I take into consideration the defendant's statements..... [7]

Later in the same soliloquy, the trial court goes on to state,

*Taking judicial notice of the file,* we had the issue of the defendant's competency to stand trial raised a few months ago, and a psychiatrist found—and I went back and looked at that again—and frankly, *independent of that,* my consideration of the statements, *I came to the same conclusions* in that actually that Mr. Pittman does, and that it is that some descriptions of and self-reporting of mental health issues may be exaggerated in this particular case.

I found that—and as the attorneys know, I have several years['] experience as a mental health professional, and I found some inconsistencies between the defendant's behaviors, his acknowledgment of very detailed events in some situation and not in others, and I took that into consideration.

*It is my considered opinion* that Mr. Crayton was in complete possession of his mental faculties and had anticipated this interview and I think prepared himself accordingly. It was one week later. He had a week to lay [sic] in the hospital. I suspect in some of that—most of that in incredible pain and perhaps under some medication. But there is no evidence of that on the day of the interview that he was transported. In fact, I think the evidence is that he was not under medication at the time of his – of his interview.

I want to give one example of the inconsistency that I see of Mr. Crayton's sometimes mastery of details and other times a seemingly foggy sense of details. When he was pressed 38 minutes into, give or take, the video, he was pressed as to whether or not he made the 911 call or whether or not Jessica Tyler Crayton made the 911 call.

.... And the defendant's apparent efforts to remember whether he made the 911 call is considered so greatly in his mind—let me look at my notes because I wrote this, and I think this is important—he considers whether his answer very carefully, because, in my mind, I believe he realized that's not something he thought about; that's not an answer he had ready, and he needed to know, if I say she did, what's the logical outcome. If I say I did, what's the logical outcome as to whether or not the 911 call was made. He needed to know whether his answer would exacerbate his situation or mitigate his situation.

. . . .

So what was his mental culpability? Intentional? Knowingly? I think his actions afterwards, his testimony, the forensic evidence, his actions afterwards

---

7. In a recorded interview with law enforcement officers, Crayton admitted he stabbed Jessica, and during the intake at the jail, he said that he killed his girlfriend.

support, at the bare minimum, that he knowingly caused the death of Tyler Crayton by stabbing her.

For the reasons that I have just articulated, the verdict of the Court is that I find the defendant guilty as charged in the indictment in this particular case. What I'm going to do now is we have to deal with the issue of punishment....
(Emphasis added).

██ Following the explanation given by the trial court for its verdict, there are four additional pages of transcript wherein the trial court and the attorneys discussed sentencing issues and concerns regarding a presentence investigation report. Thus, from soon after the trial court began its explanation of its decision until the end of the proceedings, Crayton was aware that the trial court had reviewed the competency report. At no point during this did Crayton raise any objection to the trial court's reference to the psychiatrist's opinion concerning Crayton's competency. Crayton cannot now contend that he was "unable to object" because the trial court drew its conclusions in private. The trial court announced to the parties mid-way through issuing its verdict that it had taken judicial notice of the file and, specifically, that the court had "looked at" the competency report. Although Crayton had ample time during the trial court's soliloquy to lodge an objection, he failed to make a timely objection as soon as it became apparent that the trial court was taking judicial notice of the file or had "looked at" the competency report; thus, he failed to preserve the alleged error for

our review. *See Hollins*, 805 S.W.2d at 476. Crayton's first point of error is overruled.[8]

## B. The Trial Court Did Not Err When it Denied Crayton's Motions to Suppress

██ Crayton argued at trial and argues on appeal that the actions taken by the police violated his United States Constitutional rights, his rights given him under the Texas Constitution, and Article 38.23 of the Texas Code of Criminal Procedure. Specifically, Crayton asked at trial that the following evidence be suppressed: Adidas tennis shoes, a baseball cap, eye glasses, denim jeans, a black belt, a white sleeveless shirt, a grey sleeveless shirt, one white sock, an evidence bag used to cover Crayton's left hand, a paper bag that had covered Crayton's right hand, two blood vials, ten envelopes containing fingernail clippings taken from Crayton, two oral swabs of Crayton's mouth, a bucaal swab taken from Crayton's right ring finger, Crayton's gold label blue jeans that contained blood stains, and a brown wallet, including its contents. He also sought to bar the visual observations of him made by the officers and photographs taken by the officers while Crayton was being treated at the hospitals in both Sulphur Springs and Tyler.

Crayton also filed a motion to suppress maintaining that the search warrant was unlawfully executed because the officers who executed the warrant did not have

---

8. Notwithstanding Crayton's failure to timely object, we note that a trial court may take judicial notice of all of the court's records in a case; however, it "may not take judicial notice of the truth of the factual contents" contained in the file. *Jackson v. State*, 139 S.W.3d 7, 21 (Tex.App.—Fort Worth 2004, pet. ref'd). Here, the trial court took judicial notice of the *file*, but it did not take judicial notice of the competency report independent of the file. Moreover, while the trial court stated that it "looked at" the competency report, the record shows that the trial court's decision was based on the facts of the case and not on the information contained in its file, including the competency report.

jurisdiction to execute it.[9] Specifically, the search warrant was issued by a Hopkins County district judge located in Sulphur Springs, Hopkins County, but it was executed in Smith County by Hopkins County police officers. Based on these arguments, Crayton asked the trial court to suppress any evidence seized as a result of the search warrant. The trial court held a hearing on Crayton's motions and denied them.

On appeal, Crayton (1) contends that law enforcement officers illegally seized several of his personal items and took samples from his body without first obtaining a warrant and (2) challenges the execution of the search warrant which was used to seize evidence based on the jurisdictional issue stated above. For the reasons below, we find that the trial court did not err in denying Clayton's motions to suppress.

### 1. Analysis

"We review a trial court's decision on a motion to suppress evidence by applying a bifurcated standard of review." *Graves v. State*, 307 S.W.3d 483, 489 (Tex.App.—Texarkana 2010, pet. ref'd) (citing *Rogers v. State*, 291 S.W.3d 148, 151 (Tex.App.—Texarkana 2009, pet. ref'd)). A trial court's decision to grant or deny a motion to suppress is generally reviewed under an abuse of discretion standard. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex.Crim.App. 2008). When deciding a motion to suppress evidence, a trial court is the exclu-

sive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex.Crim.App.2002). Therefore, a trial court may choose to believe or disbelieve none, all, or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App.2000).

As in this case, when a trial court makes express findings of fact, we afford almost total deference to those findings as long as they are supported by the record, and we also view the findings in a light most favorable to the trial court's ruling. *State v. Granville*, 423 S.W.3d 399, 404 (Tex.Crim. App.2014). We also afford almost total deference to a trial court's rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an assessment of credibility and demeanor of witnesses. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex.Crim.App.2013). We review de novo pure questions of law and mixed questions of law and fact that do not depend on evaluating credibility and demeanor. *Martinez v. State*, 348 S.W.3d 919, 923 (Tex.Crim.App.2011). Because all of the evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold the denial of Crayton's motions to suppress if it was supported by the record and was correct under any theory of law applicable to the case. *See Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000).

---

**9.** Crayton also filed a "Motion for Hearing Pursuant to *Franks vs. Delaware*" arguing that certain statements made in the "Affidavit for Search Warrant" were false and deliberately made by the affiant, Sergeant Investigator Lenwood Fox. Based on the alleged falsity of the statements contained in the affidavit, Crayton asked the trial court to suppress any evidence seized as a result of the search warrant. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In addition, Crayton filed another motion to suppress, arguing that the affidavit supporting the issuance of the search warrant lacked sufficient factual basis for a finding of probable cause to believe that Crayton had committed the offense of murder or that the items identified in the affidavit contained evidence of that offense. The trial court denied Crayton's motions, and he does not raise these issues on appeal.

### a. Personal Items Seized Without a Warrant

Crayton contends that the police linked him to Jessica's murder, in part, by matching her DNA to the DNA found in blood stains on some of the illegally-seized items, thereby violating his constitutional rights. The trial court disagreed and denied his motions to suppress, issuing findings of fact which confirmed the existence of exigencies and a certain amount of chaos that existed among the police during the early parts of the investigation of the murder. The trial court also issued (among others) the following conclusion of law:

> Despite a skillful attempt by defense counsel to isolate individual officers' testimony to establish a sort of "what did you know and when did you know it" scenario, under the totality of the circumstances it is clear by the actions of the officers that, based upon the quickly emerging facts they were obtaining and sharing with one another, they had good reason to believe that the last person to be with the victim had jumped off a bridge in an attempt to kill himself. The person lying on the highway (the defendant) had blood on his shoes, blood on his pants, and nicks on his hand and stomach (consistent with a possible struggle with a knife or box cutter). As such, the actions that Sgt. Weatherford and Lt. Young took in securing items from the defendant were reasonable and justifiable. Items may be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search. *Chambers v. Maroney*, 399 U.S. 42, 51 [90 S.Ct. 1975, 26 L.Ed.2d 419] (1970).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Article 38.23(a) of the Texas Code of Criminal Procedure states, "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of a criminal case." Tex.Code Crim. Proc. Ann. art. 38.23(a) (West 2005).

In order to suppress evidence based on an alleged Fourth Amendment violation, a defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim.App.2007). A defendant satisfies this burden by establishing that a search or seizure occurred without the benefit of a warrant. *Id.* The prosecution then has the burden to establish that the search and seizure were nonetheless reasonable under the totality of the circumstances. *Id.* at 672–73. Here, the record shows that Crayton's personal items taken from the League Street Bridge scene and from the Sulphur Springs hospital were seized without the benefit of a warrant. Thus, the State had the burden of proving that their actions were reasonable under the circumstances. *See id.*

At the hearing on Crayton's motions to suppress, Weatherford testified that shortly after she had been to the scene of the murder, she had been to the League Street overpass in response to a call regarding a person jumping off the bridge. Upon arriving, she found a black male (later confirmed to be Crayton) lying on the interstate highway below the bridge. There were also two plain-clothes officers and two uniformed officers already at the scene. Weatherford stated that although Crayton was conscious, he was unresponsive to questions.

Weatherford stated that there was a pair of gray, blue, and white Adidas tennis shoes beside Crayton in the roadway, and she assumed the shoes belonged to him because Crayton had no shoes on his feet. Weatherford noticed that the shoes had what appeared to be blood on them, and believing they might be evidence in the murder investigation, Weatherford took photographs of the shoes and collected them as evidence and also photographed Crayton's hand, noting that there was a cut on one of them. After Weatherford took the photographs, the baseball cap, shoes, and glasses were placed in paper evidence bags and later logged into evidence at the police station.

Captain James Sanders and Lieutenant Antwone Young were also at the scene where Crayton was found. Sanders stated that even though he could not identify Crayton, he had a "gut feeling" that he would be a suspect in the murder at Morris Drive. Young was told Crayton's name by another officer at the scene and was also told the identity of his spouse as a murder victim. Young followed Crayton to the hospital to retrieve Crayton's clothing because he did not want the clothes to be "contaminated or destroyed." When Young arrived at the hospital, the medical personnel asked him if he wanted to take possession of Crayton's clothing. Believing it was an "emergency situation," Young agreed and took the items of clothing, secured them as evidence in the murder investigation, and turned them over to the detective (Fox) he believed would be working the case. By that point, Young was aware that officers were attempting to obtain a search warrant.

■■■ The State contends that Crayton's shoes, cap, and glasses were in plain view of the officers when they arrived at the League Street Bridge scene. We agree. The plain-view doctrine is more than a mere exception to the warrant requirement of the Fourth Amendment. *Walter v. State*, 28 S.W.3d 538, 541 (Tex. Crim.App.2000) (citing *Texas v. Brown*, 460 U.S. 730, 738–39, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)). Due to the fact that the article is in plain view, neither its observation nor its seizure involves an invasion of a person's privacy. *Id.* To satisfy the plain-view analysis of obtained evidence, a law enforcement officer must meet two requirements. *Ramos v. State*, 934 S.W.2d 358, 365 (Tex.Crim.App.1996). First, the officer must have a right to be in the location where the item is in plain view. *Id.* Second, it must be immediately apparent that the item found in plain view amounts to probable cause that it is associated with a crime, contraband, or otherwise subject to seizure. *Id.*

■■■ "The [United States] Supreme Court has construed 'immediately apparent' to mean simply that the viewing officers must have probable cause to believe an item in plain view is contraband before seizing it." *State v. Dobbs*, 323 S.W.3d 184, 189 (Tex.Crim.App.2010). " 'Probable cause merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief ... certain items may be contraband.' " *Hill v. State*, 303 S.W.3d 863, 873 (Tex.App.—Fort Worth 2009, pet. ref'd) (quoting *Miller v. State*, 686 S.W.2d 725, 728 (Tex.App.—San Antonio 1985, no pet.)). "An officer may rely on training and experience to draw inferences and make deductions as to the nature of the item seen." *Id.* at 873–74 (citing *Nichols v. State*, 886 S.W.2d 324, 325–26 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd). Thus, the item viewed "must be seen and weighed not in terms of library analysis by scholars but as understood by those versed in the field of law enforcement." *Miller v. State*, 686 S.W.2d 725, 728 (Tex.App.—San Antonio 1985, no

pet.). Actual knowledge that the object is incriminating evidence is not required because probable cause does not necessitate a showing that the officer's belief is accurate. *Hill,* 303 S.W.3d at 873; *Miller,* 686 S.W.2d at 728.

■ In this case, officers were dispatched to the League Street Bridge in order to assist Crayton, who had either fallen off the bridge onto the interstate or intentionally jumped off the bridge. In either event, the officers had not only a right, but a duty to be at the scene. When officers arrived, they found Crayton lying on the interstate, unable to speak or even answer simple questions. Multiple officers, including Weatherford, saw what they believed to be blood on Crayton's shoes, blood on his pants, and a cut on his hand. Weatherford testified that when she noticed Crayton's shoes with blood on them, she believed that they might be evidence in Jessica's murder investigation. The officers were fully aware of the murder which had taken place and suspected that Crayton might well have had a hand in the killing. When officers are privileged pursuant to the plain-view doctrine to observe or seize an item, they are likewise privileged to take photographs or make a video recording of that item. *See Carmen v. State,* 358 S.W.3d 285, 293 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

For these reasons, we find that the trial court did not err when it denied Crayton's motion to suppress as it related to the items (his shoes, cap, and glasses) taken at the site where he was located on the interstate. This same rationale applies to the photographs taken of him at that time.

■ Crayton also claims that his clothes were illegally seized while he was at the Sulphur Springs hospital. A warrantless search by law enforcement officers is presumptively unreasonable. *Gutierrez v. State,* 221 S.W.3d 680, 685 (Tex.

Crim.App.2007). However, the warrant requirement may be set aside when the prosecution demonstrates that exigent circumstances existed at the time of the warrantless search. *Id.* The State bears the burden of proof through a two-step process to show that such exigent circumstances existed. *Parker v. State,* 206 S.W.3d 593, 597 (Tex.Crim.App.2006). First, the police must have probable cause to search a specific location. *Id.* Second, exigent circumstances must exist to justify a warrantless search and seizure. *Id.* If either probable cause or exigent circumstances are not established, a warrantless search or seizure will not pass muster under the Fourth Amendment. *Id.* Under the "fruit of the poisonous tree" doctrine, evidence may not be used against a criminal defendant when it was obtained by an illegal search or seizure and not by means sufficiently distinguishable to be purged of the primary taint. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Thornton v. State,* 145 S.W.3d 228, 232 (Tex.Crim.App.2004). Under the "fruit of the poisonous tree" doctrine, any evidence derived directly or indirectly from illegal governmental action must be excluded at trial. *See Thornton,* 145 S.W.3d at 232.

For the reasons discussed above, there was sufficient probable cause to believe that Crayton's clothes, which were located at the Sulphur Springs hospital, contained evidence of a crime. As to the second requirement of the necessity of exigent circumstances, in addition to Young's testimony above, he also testified that he followed Crayton to the hospital to retrieve his clothing because he did not want his clothes to become "contaminated or destroyed." Young's assumption that Crayton's clothes might very possibly become contaminated or be destroyed if they passed through the hands of various hospi-

tal personnel or even Crayton's family or friends, was a reasonable assumption. However, prior to Young actually seizing Crayton's clothing, medical personnel asked Young if he wanted to take possession of Crayton's belongings. Believing it was an "emergency situation," Young agreed and took Crayton's clothes, secured them as evidence in the murder investigation, and turned them over to Fox.

Crayton points out that the trial court did not make a specific finding of exigent circumstances. Based on the testimony at the hearing, the trial court found that the officers at the League Street Bridge scene had "good reason to believe" that the person they were dealing with was the suspect in Jessica's murder. Moreover, the trial court's findings set out the chaotic events in detail, and although the words "exigent circumstances" were not included, it is clear from the court's quite lengthy findings and conclusions, that it believed the circumstances were sufficiently exigent to have justified a warrantless seizure. If the trial court's decision is correct on any theory of law applicable to the case, we should affirm the decision. *See Carmouche,* 10 S.W.3d at 327–28. Based on the evidence presented during the hearing, we cannot find that the trial court abused its discretion when it denied Crayton's motion to suppress as it related to the seizure of Crayton's clothes at the hospital in Sulphur Springs. Accordingly, we deny Crayton's assignment of error as it pertains to the ruling allowing that evidence.

### b. Improper Execution of Search Warrant

In his final point of error, Crayton maintains that the officers who executed the search warrant did not have jurisdiction to conduct the search or to seize certain evidence that was introduced. Specifically, Crayton contends that the items and information seized from his person during his stay at the Tyler (Smith County) hospital were illegally seized by Sulphur Springs (Hopkins County) officers. As the basis for this complaint, Crayton asserts that the Hopkins County officers did not have jurisdiction to execute a warrant in Smith County. The trial court held a hearing, considered Crayton's arguments, and denied his motions. In doing so, the trial court made the following findings of fact as they related to this issue:

11. When the search warrant was signed, the defendant was located at the Hopkins County Memorial Hospital.

12. The defendant was transferred from the hospital in Hopkins County to a hospital in Smith County because of his serious and obvious life-threatening medical condition, caused by his apparent jump off of the I–30 bridge onto the highway.

The trial court's conclusions of law were as follows:

4. The fact that Det. Fox, at least in part, executed the warrant in Smith County does not vitiate the warrant or require that any evidence obtained pursuant to it be excluded in a subsequent trial. Officers are to execute warrants without delay. The fact that the body of the person was being care-flighted to another county in an attempt to save his life should not be seen as frustrating the duty the officer has to execute lawful process issued by a magistrate or court. To suggest that the warrant could have been properly executed only by taking along a Smith County peace officer to collect the clothes and instruct the medical personnel to obtain the required medical samples would lead to absurd results. In this case, time was of the essence.

Additionally, this was not a search in the traditional sense of the word, where officers are searching a location to uncover evidence. Here, it's the person himself (and some of his easily obtainable personal items).

5. There does not appear to be any case law directly on point for this issue of [a Sulphur Springs Police Department (SSPD)] officer executing a search warrant in a "foreign" county. However, the CCA has addressed the principle at issue in the case of *Green v. State*, 799 S.W.2d 756 (Tex.Crim.App.1990). That case dealt with the timeliness of the execution of a search warrant. The defendant in that case clearly was angling to win her case on a technical snafu.

6. *Green* stands for the proposition that the two objectives of the law concerning search warrants are to ensure there is adequate probable cause to search and to prevent a mistaken execution of the warrant against an innocent third party. These objectives are not furthered by rigid application of the rules concerning warrants. Just as courts will evaluate the encompassing issue of probable cause by measuring the factual sufficiency of an affidavit and warrant by the "Totality of Circumstances" test enunciated in *Illinois v. Gates,* so are we to review technical deficiencies with a judicious eye for the procedural aspects surrounding issuance and execution of the warrant. To do otherwise would defeat the purpose behind the warrant requirement, and provide protection for those to whom the issue on appeal is not one based upon the substantive issue of probable cause but of technical default by the State.

Crayton points out that in *Keen,* the Court of Criminal Appeals held that when an officer executes a search warrant outside of his jurisdiction, he must be assisted by an officer with jurisdiction at the location the warrant is executed.[10] *Keen v. State,* 626 S.W.2d 309, 313 (Tex.Crim.App. [Panel Op.] 1981) (citing *Reynolds v. State,* 506 S.W.2d 864, 865 (Tex Crim.App.1974); *Gilbert v. State,* 493 S.W.2d 783, 784 (Tex. Crim.App.1973)), *abrogated on other grounds by Wilson v. State,* 977 S.W.2d 379 (Tex.Crim.App.1998).

The State responds that this particular case is unusual in that the "thing" to be searched was Crayton's "person" and that, as such, it was mobile (in the process of being taken by helicopter to another county in an effort to save his life, unbeknownst to the detectives obtaining the search warrant). The State further maintains that even if the execution of the warrant by the Sulphur Springs officers was improper, Crayton suffered no harm that would require reversal because Crayton confessed to stabbing Jessica shortly after the event occurred.

■ "It is the duty of every peace officer to preserve the peace within the officer's jurisdiction. To effect this purpose, the officer shall use all lawful means." Tex.Code.Crim. Proc. Ann. art. 2.13(a) (West 2005). Article 2.12(3) of the Code of Criminal Procedure provides that police officers of incorporated cities or towns, like those in the Sulphur Springs Police Department, are peace officers. *See* Tex.Code Crim. Proc. Ann. art. 2.12(3) (West Supp.2015). A peace officer's juris-

---

10. Although the record at trial showed that there were Smith County officers present when the Sulphur Springs officers executed the warrant, we find nothing in the record of the hearing on Crayton's motions to suppress to reflect this.

diction—the geographic limit of his authority—is controlled by common law if not specified by statute. *Meadows v. State,* 356 S.W.3d 33, 40 (Tex.App.—Texarkana 2011, no pet.) (citing *State v. Kurtz,* 111 S.W.3d 315 (Tex.App.—Dallas 2003), *aff'd,* 152 S.W.3d 72 (Tex.Crim.App.2004)); *see Angel v. State,* 740 S.W.2d 727, 732–33 (Tex.Crim.App.1987) ("[T]he legislative expression of a peace officer's jurisdiction must be found in some other statute or be controlled by common law."), *overruled on other grounds by State v. Kurtz,* 152 S.W.3d 72, 74 (Tex.Crim.App.2004). Therefore, unless there is some statutory authority for an extension of jurisdiction, the city police officer's jurisdiction is limited to the city's geographical boundaries. *Meadows,* 356 S.W.3d at 40.

However, in *Meadows,* this Court found the *Kurtz* line of cases to be distinguishable because the investigative stop in *Kurtz* related to detention (in other words, falling under the power of arrest) rather than a search. *Id.* In *Meadows,* the issue was a "home-rule" municipal police force's jurisdiction as to the execution of a valid search warrant. *Id.* The same is true in this case; it involves the execution of a valid search warrant, not an arrest warrant. In *Meadows,* we quoted the Fort Worth Court of Appeals, stating that "a home-rule municipal police force's jurisdiction for the execution of a valid search warrant is at least as broad as that of a general-law municipality, that is, at least county[ ]wide." *Meadows v. State,* 356 S.W.3d at 40 (quoting *$27, 877.00 Current Money of United States v. State,* 331 S.W.3d 110, 117 (Tex.App.—Fort Worth 2010, pet. denied), *aff'd,* 166 S.W.3d 255 (Tex.Crim.App.2005). It is the duty of every peace officer, when a search warrant is duly delivered to him, to "execute the warrant without delay." TEX.CODE CRIM. PROC. ANN. art. 18.06 (West 2015). A search warrant is sufficient if it "com-

mand[s] any peace officer of the *proper county* to search forthwith the person, place, or thing named." TEX.CODE CRIM. PROC. ANN. art. 18.04 (West Supp.2015) (emphasis added).

During the hearing on the motions to suppress, Fox was asked, "But when you walked away from the courthouse—was it your understanding, first of all, when you swore to the affidavit and was [sic] in front of the judge that the—that Mr. Crayton was at the Hopkins County Memorial Hospital?" Fox answered that it was his understanding that Crayton was located in the hospital in Hopkins County. It was after the district court approved and signed the warrant that Fox then contacted Detective Gilmore, who had been at the Hopkins County hospital with Crayton. It was then that Fox learned Crayton had just been loaded into a helicopter to be transported to the Tyler hospital in Smith County. Shortly thereafter, Fox and Gilmore drove to Tyler to the hospital to execute the search warrant. Acting with good-faith reliance on the warrant, the detectives collected oral swabs from Crayton and his fingernail clippings. A nurse drew two vials of Crayton's blood.

There is no doubt that this case consisted of an array of unfortunate circumstances, not the least of which was Jessica's death, Crayton's virtually simultaneous suicide attempt, and the unforeseen movement of the evidence which was sought (Crayton's person) to Smith County. Likewise, there is no question that the Sulphur Springs officers acted in good faith when they executed the search warrant. Nevertheless, the Sulphur Springs officers executed a search warrant in Smith County, which was not only outside of the Sulphur Springs city limits, it was also outside of Hopkins County. The officers were, therefore, outside the jurisdiction in which they

had authority to execute the search warrant. Accordingly, the trial court erred when it failed to grant Crayton's motion to suppress regarding the evidence obtained as a result of the improperly executed search warrant.

■■■ The erroneous admission of evidence over a valid Fourth Amendment objection is a constitutional error, and reversal is required unless the appellate court determines beyond a reasonable doubt that the error did not contribute to the conviction. *Hernandez v. State*, 60 S.W.3d 106, 106 n. 1 (Tex.Crim.App.2001); *see* Tex.R.App. P. 44.2. The reviewing court must reverse the conviction if there is a reasonable possibility that the error, within the context of the trial, shifted the verdict from an acquittal to a conviction. *Davis v. State*, 203 S.W.3d 845, 852–53 (Tex.Crim.App.2006).

In addition to the caselaw, we are directed by Rule 44.2(a) of the Texas Rules of Appellate Procedure, which states, "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex.R.App. P. 44.2(a).

■■■ In making this determination, the appellate court must consider the entire record and weigh the following factors: "(1) the importance of the [complained-of] evidence to the State's case; (2) whether

the ... evidence was cumulative of other evidence; (3) the presence or absence of other evidence corroborating or contradicting the [complained-of] evidence, ...; (4) the overall strength of the State's case"; and (5) any other factor in the record that affects the probable impact of the error. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim.App.2007) (citing *Davis v. State*, 203 S.W.3d 845, 852 (Tex.Crim.App.2006)).

In this case, the items seized as a result of the improperly executed search warrant were Crayton's fingernail clippings, two oral swabs from Crayton, and Crayton's blood. These were the sole sources of Crayton's DNA, which was used in comparison. Likewise, any information gleaned from that evidence should not have been considered. The properly admitted evidence that was available for the trial court's consideration included, in part:

1. Crayton's blood-stained shoes and photographs of the shoes at the scene

2. Crayton's blood-stained jeans found in the bedroom of the Morris Drive residence and photographs of those jeans; [11]

3. one white sock with a blood stain found in the same bedroom at Morris Drive; [12]

4. a photograph of Crayton's feet, which showed that Crayton was then wearing only one (white) sock and no shoes on either foot;

5. a DVD of an interview of Crayton confessing to officers that he stabbed Jessica, his explanation being because he just "snapped";

11. Approximately six weeks after the incident, the victim's mother and sister returned to the Morris Drive residence in order to clean. Looking for a pair of Jessica's jeans, they found a pair of Crayton's jeans at the foot of the bed. The jeans had blood on them. When the mother picked them up, Crayton's wallet fell out. The sister took the jeans to the SSPD, who had not seen the jeans during

their initial investigation. The jeans were turned over to the SSPD and were later analyzed for any potential evidence.

12. The one white sock was found by Fox in a secondary search, which was made very soon after the initial search and was conducted with the consent of the victim's mother.

6. a photograph of blood on Crayton's fingernails;

7. a photograph of the cut on the webbing between Crayton's thumb and index finger;

8. photographs of Jessica's body;

9. photographs of the multiple wounds to Jessica's body;

10. Jessica's DNA;

11. the knife and photographs of the knife used to kill Jessica;

12. Crayton's statement given to officers describing the knife he used to kill Jessica;

13. photographs of the rooms in the residence, along with blood splatter on the walls and floor;

14. a video recording of the residence;

15. Crayton's wallet containing his driver's license that fell out of Crayton's jeans found at the Morris Drive residence; and

16. Jessica's autopsy report, including photographs.

In addition, the trial court heard from Amanda Anthony, the jailer at the Hopkins County Jail who interviewed Crayton in regard to his medical history upon his entry into the jail. When Anthony asked Crayton if he had ever attempted suicide, Crayton responded, "Yes." When asked when and why he had attempted to commit suicide, Crayton answered that it was in 2013 and because "[he] killed [his] girlfriend." Multiple people testified regarding the troubled nature of Jessica and Crayton's marriage. In further support of that testimony, the State introduced a letter written by Jessica and intended to be read by Crayton that concluded with the words "[i]f you leave make sure you can stay gone forever. I love you! Just wished you loved me." The trial court also heard testimony that Jessica's mother had believed that Crayton and Jessica were the only two individuals in the residence when she left for work on the day of the murder.

There was ample evidence in this case to prove Crayton's guilt, even if the trial court had excluded the evidence obtained as a result of the search warrant executed in Smith County. First, much of the evidence was found and many of the photographs were taken at the Morris Drive residence, which was owned by Jessica's mother. Jessica's mother gave written consent for the law enforcement officers to search her residence. In addition, multiple witnesses testified that there had been troubles in their marriage due to Crayton's infidelities and Jessica's temperament. Crayton confessed not once, but twice, to stabbing Jessica. In Crayton's own words, he just "snapped." Crayton described the knife he used, which was very similar to the knife found at the Morris Drive residence. Crayton detailed specific facts when speaking with the officers that were consistent with where the incident occurred in the house and he also admitted that nobody else was present in the home. During his intake interview at the jail, Crayton linked the day of his suicide attempt to the day of Jessica's murder, and even stated that the reason for the attempt to take his life was because he tried to kill his girlfriend, which the fact-finder could presume was Jessica. There were stains[13] on Crayton's jeans found at the Morris Drive murder scene that matched Jessica's DNA. The DNA laboratory report stated, "The probability of selecting an unrelated person at random who could be the source

---

13. The laboratory report stated that a presumptive test for the presence of blood was positive on stains on Crayton's left shoe, stains on Crayton's right shoe, a stain on Crayton's sock, and stains on Crayton's blue jeans. From this information, the fact-finder could assume that the word "stain" in the report referred to a blood stain.

of the major component in this profile is approximately 1 in 28 quintillion for Caucasians [14] . . . ." The stains on Crayton's left and right shoes were consistent with Jessica's DNA profile. In order to match an unrelated person as the source of the DNA profile, the odds would be approximately "1 in 28 quintillion for Caucasians." The stain on the sock found in the bedroom of the residence was consistent with Jessica's DNA profile; however, the swabbing of the interior of the sock was not. Further, there was testimony from the officers that the blood on Crayton's clothing and his shoes did not appear to be a result of his fall.

As can be seen, there was overwhelmingly ample evidence in the case (exclusive of that obtained as a result of the search warrant executed in Smith County) to prove beyond a reasonable doubt Crayton's guilt in the stabbing death of Jessica.

The complained-of error in this case was not determinative of Crayton's guilt, and even if the evidence obtained through the search warrant had been excluded, the evidence of Crayton's guilt was nevertheless overwhelming. Therefore, the error in admitting it was harmless. Crayton's second point of error is overruled.

## III. Conclusion

Based on the foregoing, we affirm the trial court's judgment.

---

14. Although Crayton is black, Jessica was Caucasian.