**AFFIRMED; Opinion Filed April 17, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00257-CR

**ALI L. GHANBARI, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-81974-2013**

# MEMORANDUM OPINION

Before Justices Bridges, Partida-Kipness, and Carlyle
Opinion by Justice Carlyle

Following appellant Ali L. Ghanbari's not-guilty plea, a jury convicted him of aggravated robbery and assessed punishment at twenty-seven years' imprisonment. In five issues on appeal, appellant contends (1) the evidence is legally insufficient to support his conviction; (2) the trial court erred by not excluding unlawfully obtained cellphone evidence; (3) the trial court erred by not properly instructing the jury respecting appellant's liability as a party; and (4) because a portion of the trial court record is missing, appellant is entitled to a new trial. We affirm.

## I. FACTUAL AND PROCEDURAL CONTEXT

The indictment in this case alleged that on November 21, 2012, while committing theft, appellant "intentionally or knowingly threaten[ed] or place[d] Robert Brady III in fear of imminent bodily injury or death" and "did then and there use or exhibit a deadly weapon, to-wit: a firearm."

Appellant filed pretrial motions to suppress two types of cellphone evidence: (1) "electronic customer data" obtained from cellphone service providers and (2) data police extracted from a cellphone. Following a pretrial hearing, the trial court denied those motions to suppress.

At trial, Brady testified that on the date in question, he was living in an apartment in Plano with several roommates. Brady had met appellant approximately four months earlier when Brady began buying marijuana from appellant to use and sell. One of those transactions took place at Brady's apartment. While at Brady's apartment, appellant asked Brady if he had any guns. Brady said he had a pistol and appellant asked to see it. When Brady went into his bedroom closet to remove the pistol from its safe, appellant followed him. Brady asked appellant to "step back" because he was "not comfortable with [appellant] being in there." After seeing the gun, appellant expressed interest in buying it, but then told Brady the asking price was too high. Brady testified he "just got really sketchy vibes" from appellant during that visit.

According to Brady, after that visit, he made only one additional purchase from appellant, but appellant continued trying to sell to him "often." On November 7, 2012, appellant texted Brady, soliciting him to purchase more marijuana, and saying "don't be flaky bro." Brady did not respond.

Brady testified that several days before the incident in question, his friend Sawyer told him someone was "setting up a hit" on Brady's apartment, which Brady understood to mean someone was planning to "rob me." Brady stated that based on that conversation, appellant was the person he "thought the threat came from." Following that conversation, Brady purchased a shotgun. Brady "confront[ed] [appellant] via text message," saying, "just cuz i dont want your business doesent mean im flakey and whats this i hear you setten up a lick on my place?"

At approximately 3 a.m. on November 21, 2012, Brady was lying in bed awake when an object came "flying" through the glass patio door in his room, shattering the glass. He then saw

"two pairs of legs hit the patio." Brady grabbed his shotgun, which was next to his bed. He testified that in a matter of seconds, one of the two persons from the patio "made it inside" his bedroom, stood at the foot of his bed, and "raised their arm up." Brady shot at that person three times. Brady's roommates heard the shots and called 9-1-1. Brady testified the person he shot at was "deceased on the floor." The second person Brady had seen on the patio fled without entering the apartment.

Brady stated that at some point, the police started asking him questions "about someone named Ali." He told police about appellant's previous visit to his apartment and the text messages described above. Brady later learned the deceased was Chinedu Onyeuku, whom he had not met or seen before.

On cross-examination, Brady testified (1) he initially told police he did not sell drugs, which was a lie; (2) he told police the individuals he saw were "two black males," but he actually did not know the race of the second man on the patio; and (3) he did not mention appellant's name to police until they specifically asked about appellant more than a month after the incident in question.

Tiaira Erwin testified she and Onyeuku met in junior high school in Nebraska and moved to Dallas in 2006. At the time of these events, they had been "in a relationship" for twelve years and had two children together. On the evening in question, Onyeuku ate dinner with her and the children, then left with a friend who was visiting from Nebraska, Benny Valentine. Erwin expected Onyeuku to return home later that night, but he did not. At approximately 5:30 a.m. on November 21, 2012, Erwin received a phone call from Valentine's mother, Kimberly Lessley, who lived in the Dallas area. From that phone call, Erwin learned (1) "[Onyeuku] was shot," (2) she "need[ed] to look for him" in Collin County; and (3) Onyeuku's car was at Lessley's home. Erwin immediately went to Lessley's home.

Inside Onyeuku's car, Erwin found a black Android cellphone she thought was Onyeuku's. But when Erwin called her own phone from the black Android phone, she saw the phone number was not Onyeuku's. She started "calling the numbers out of the phone" and asking "whose phone is this" and "where is [Onyeuku]." She contacted a Plano police officer who worked at the bank where she was employed and asked if he could help her locate Onyeuku. At about noon that same day, Erwin took the black Android phone to a Plano police station. As she was walking into the police station, that phone received an incoming call and she answered it. A male voice asked where she was and told her not to give the phone to police. Erwin ended the call and started "going through the text messages" in that phone. She "saw a conversation with the owner of that phone" and "saw [Onyeuku's] number in there." She gave the black Android phone to police.

Plano police detective Brian Pfahning testified that while investigating the incident described above, he observed Erwin's interview at the Plano police station. Based on information from that interview, he obtained a search warrant to extract data from the black Android phone Erwin gave police. The extracted data included contacts, incoming and outgoing calls and text messages, and the phone number associated with the phone. Pfahning stated that in that data, he found text messages using the phrase "hit a lick," which was "indicative of some discussion of a robbery." Printouts of the phone's data were admitted into evidence over appellant's objection.

Pfahning testified one of the text message exchanges from the black Android phone was between the phone's owner, "Ali," and a contact described in the phone data as "Nebraska." Specifically, (1) Ali sent a text message to Nebraska at 10:50 a.m. on November 15, 2012, that read "U still wanna hit that lick with me"; (2) about seven minutes later, Nebraska responded "yup" and "call me"; (3) the next day, Nebraska texted Ali "Told my Lil homie about it..Told me he could be here tomorrow"; (4) Ali responded "Let's do it then"; (5) on November 17, Nebraska texted Ali "My people will be here tonight"; (6) the next morning, Ali responded "Is ur homie in

–4–

town im ready to hit that lick when you are"; (7) shortly after midnight on November 21, Nebraska texted Ali "What's goin on bro"; and (8) the data showed a phone call from Ali to Nebraska at 1:41 a.m. on that date.

Additionally, the extracted data included a November 18, 2012 text message exchange between Ali and "Robert." Specifically, a text from Robert to Ali stated "just cuz i dont want your business doesent mean im flakey and whats this i hear you setten up a lick on my place? Looks like it was a mistake trusting you with where I live. . . ." Ali responded to Robert with several messages sent within a few minutes of each other: "Wtf im not doing [expletive] I make enough money go [expletive] yourself"; "Who said that [expletive] I'll go clear this up"; and "If I wanted u jacked it would've been done with one phone call to n u would have 3 mexicans kicking in ur door and tying up everybody till they got whatever they want. if I wanted to I would've done it." Six minutes after responding to Robert, Ali texted a contact named "Isaac," asking "How does Robert know im jacking him." Isaac immediately responded, "Idk just call me." Pfahning testified "jacking" means "they're either going to rob him or steal his stuff."

Plano police detective Daniel Caballero testified that on the date of the incident in question, he was dispatched to the crime scene and assigned to lead the investigation. He saw a "Smith & Wesson .38 caliber revolver" on the floor "within very close proximity" to Onyeuku's body. The apartment's occupants "did not identify the revolver as being their property." Caballero stated he believed the revolver "came from an outside source; the deceased person."

After Caballero returned to the police station, he learned Erwin had contacted police and provided an Android phone that she told police was "associated" with the name "Ali." Caballero testified he and other detectives started "running the name and the phone number through open source databases, public databases, internet databases" to "learn[] who this name and phone number came back to" and "that's how we learned the identity of Ali Ghanbari." Also, Caballero

–5–

looked through data extracted from the cellphone to obtain information that might be related to the case. He testified (1) Erwin had provided police with Onyeuku's phone number; (2) in the Android phone Erwin gave police, he saw text messages between "the Ali phone, Android phone" and "a contact in that phone labeled Nebraska"; (3) he "identif[ied] the contact name in the phone of Nebraska with the phone number as Chinedu Onyeuku"; and (4) "in reviewing those text messages, there's contact between Ali and [Onyeuku] about committing a robbery."

Additionally, Caballero stated (1) he collected DNA samples from "multiple people" and sent those samples and the .38-caliber revolver to a crime laboratory "for comparison purposes," and (2) after speaking with Kimberly Lessley, he traveled to Nebraska to interview Benny Valentine and collect a DNA sample from him. In early January 2013, an additional gun, a ".357 Smith & Wesson revolver," was found in some bushes near Brady's apartment. That .357 revolver was atypical in that it held eight rounds of ammunition rather than the usual six rounds.

Appellant was arrested in this case in January 2013 and Valentine was arrested in April 2013. Both were charged with aggravated robbery. During appellant's initial interview with police, he (1) denied knowing Onyeuku and (2) told police that his cousin Ramean Shani "thinks I broke into his house" and stole from him. Caballero testified (1) based on his investigation, he believed appellant was "the ring leader" of the offense, and (2) Valentine "cooperated" with police and provided information that was helpful in "building a case against [appellant]."

Christopher Turrentine testified he and Onyeuku grew up together in Nebraska. After moving to Dallas in 2010, Turrentine met appellant while working with him at a car dealership. Turrentine introduced appellant to Onyeuku. A "long" time after that introduction, Turrentine ran into appellant and spoke with him. Turrentine testified appellant told him Onyeuku is "pretty cool." Also, Turrentine testified that at the time of the incident in question, Onyeuku was unemployed and "needed income."

Richard Sawyer Levit testified that at the time of the events described above, he was friends with appellant and was acquainted with Brady. Levit stated appellant told him about "a plan to rob or jack Robert Brady" with "some ghetto thugs." Levit told appellant "that's not a good idea, don't do it." Later that same day, Levit ran into Brady's roommate Brandon. Levit told Brandon, "I know something's going to happen to you, to your apartment; so if you need to get protection, or do whatever you need to do, or go to a hotel, whatever, you need to go do it." Levit stated he called appellant in November "around Thanksgiving" and "something was—crazy was going on; and during that he had stated to me, my—my boys just got shot, and then hung up the phone."

Mojgan Bernstein testified she is a professional translator fluent in Farsi. She was asked by the Collin County district attorney's office to translate and transcribe several "jail calls" made from a Collin County detention facility after appellant's arrest. The inmate "PIN number" used to make those calls was appellant's. In two of those calls, the caller stated his name was "Ali Ghanbari" and referred to the recipient of the call as "dad." The parties to the calls spoke partly in Farsi. Transcripts of those two calls translated into English were admitted into evidence over appellant's objection and published for the jury.[1]

---

[1] The English transcripts of those calls contained the following exchange:

> Ali: Goddamn man. You don't think I'll be out of here by Tuesday?
> Dad: I don't know. Hey tell me, they find the stolen guns from Ramean in front of somebody's apartment?
> Ali: I don't know.
> Dad: Did he tell you anything?
> Ali: Dad. Don't talk about this.

. . . .

> Dad: Okay. Why you charged?
> Ali: That's what—that's what the charge is.
> Dad: As the main suspect?
> Ali: It's armed robbery.

. . . .

> Dad: They killed one person?
> Ali: Yes.
> Dad: With your gun? I mean his gun?
> Ali: No. Someone that had a gun too. They killed him.

. . . .

> Dad: Wow, he is dead.
> Ali: They killed him with two shots.
> Dad: Don't say his name.
> Ali: Yeah. I know. I know. They shot him with a hollow point.
> Dad: Who did it?
> Ali: That boy that they hit him.

Plano police officer Dale Patton testified he collected evidence from the crime scene described above, including a large "river rock" from the master bedroom and a .38-caliber revolver from the bedroom floor near the deceased. Although the serial number on the .38-caliber revolver had been "obliterated," a firearms examiner performed a "restoration analysis" and was able to determine the serial number.

Roozbah Shani testified he and his brother Ramean Shani are appellant's cousins. According to Roozbah, Ramean lived in Plano several years earlier and owned guns at that time. Roozbah testified one of Ramean's guns was a revolver "that had eight rounds," and that the .357 revolver found in the bushes outside Brady's apartment "looks like the gun that my brother owned."

Plano police officer Katie Drambareanu testified that on January 8, 2013, Ramean Shani made "a delayed report of a burglary." The list of stolen property included three Smith & Wesson firearms. Further, Plano police detective Glen Harris testified he traced the serial numbers on the two revolvers found at the crime scene and obtained a report from the U.S. Bureau of Alcohol, Tobacco, and Firearms showing Ramean Shani purchased those guns in February 2010.

Rachel Burch testified she is a forensic DNA analyst at the University of North Texas Center for Human Identification. Her responsibilities include "mak[ing] comparisons" between the "DNA profile" on a piece of evidence and an individual's "known profile" to "see if that person

---

Dad: The one that you were at his house and you escaped?
Ali: Yes, dad. It was there.

. . . .

Ali: I saw it that they killed him.
Dad: Oh, did you not say anything yet?
Ali: No. I haven't said anything yet. Nothing.

. . . .

Dad: This person that they killed, did they kill him with these stolen guns?
Ali: No. He already had a stolen gun in his hands.
Dad: So they didn't belong to Ramean.
Ali: No.
Dad: Okay. Don't say anything anymore.
Ali: Okay.

can be included or excluded as being a [DNA] contributor of that evidentiary item." She conducted DNA testing on multiple items of evidence in this case and compared DNA found on those items with DNA profiles of several known individuals, including appellant and Onyeuku. Burch stated in part (1) from the "mixed DNA" on the .38-caliber revolver, she identified two "major contributors" and two "minor contributors"; (2) appellant and Onyeuku were possible "major contributors" respecting that DNA; and (3) the results were "inconclusive" regarding the "minor contributors." Burch was unable to determine a "major contributor" respecting the DNA on the .357 revolver.

On cross-examination of Burch, counsel for appellant stated, "I just want to go over a couple of things and summarize some things we talked about yesterday. In addition to the guns in this case, you also tested some other items. Correct?" Burch stated that her DNA testing of each of those items, including the river rock, either showed "no results" or was "inconclusive." Additionally, Burch testified the DNA mixture in this case contained some portions of DNA that did not match the samples from the known individuals.[2] Following Burch's testimony, the State rested its case. Appellant moved for a directed verdict, which the trial court denied.

The defense called Benny Valentine as its sole witness.[3] Valentine testified that at the time of the events in question, he was living in Nebraska and was on probation for an offense unrelated to this case. On November 19, 2012, his longtime friend Onyeuku called and asked him to come to Texas to help him "hit a lick that had been set up" by "somebody." Valentine flew to Dallas the next day, in violation of his probation. After dinner with Onyeuku's family, he and Onyeuku left in Onyeuku's car. They met up with a man named "Ali" in the early morning hours of November

---

[2] Approximately nine minutes into the defense's cross-examination of Burch, the reporter's record states as follows: "The proceedings from this point until the beginning of Volume 8 have been irretrievably lost due to equipment failure and through no fault of the Appellant." There is no further testimony of Burch in the record.

[3] Counsel for the defense requested permission to treat Valentine as a "hostile witness" and "proceed with leading questions." The trial court granted that request.

21. According to Valentine, Ali resembled a character on the television show "Drake & Josh." A photograph of that character was admitted into evidence and published to the jury.

Valentine testified he "knew there was going to be a robbery." He moved to the back seat of Onyeuku's car and Ali got into the front passenger seat. Ali spoke with Onyeuku about "the plan" and "handed [Onyeuku] something." Then, Onyeuku drove to an apartment complex and parked in the parking lot. All three got out, leaving their phones in the car. Valentine's role was to "be a watchout." He said he did not have a gun, but remained in a grassy area near the parking lot. He heard glass shattering, then gunshots, but "couldn't see anything." He "froze for a little bit" and then Ali "run past me, jumped in [Onyeuku's] car," and "started driving off." Valentine "made him stop" and told him they needed to "check on" Onyeuku. Ali left the car and ran. Valentine never saw him again.

Valentine said he remained at the apartment complex for about twenty minutes and watched from a distance as police and paramedics arrived. Then, he drove Onyeuku's car from the apartment complex to his mother's house. He told his mother he thought Onyeuku had been shot. His mother took him to the airport and he returned to Nebraska that same day. In April 2013, police detectives from Plano came to Nebraska to question him, he admitted his part in the incident, and he later pleaded guilty to aggravated robbery.

The charge of the court stated in part,

A person is a party to an offense and criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

. . . .

[I]f you find from the evidence beyond a reasonable doubt that on or about the 21st day of November, 2012, in Collin County, Texas, the defendant, ALI L. GHANBARI, acting with intent to promote or assist the commission of the offense, if any, he solicited, encouraged, directed, aided or attempted to aid Benny Valentine or Chinedu Onyeuku to, while in the course of committing theft of property and with intent to obtain and maintain control of said property, intentionally or knowingly threaten or place Robert Brady, III in fear of imminent bodily injury or

–10–

death, and Benny Valentine or Chinedu Onyeuku did then and there use or exhibit a deadly weapon, to-wit: a firearm, then you will find the defendant guilty of Aggravated Robbery as charged.

Also, at the State's request, the following was added to the charge: "The witness, Benny Valentine, is an accomplice to this offense. If you find that an offense was committed, you cannot convict the defendant upon Valentine's testimony alone . . . unless you further believe that there is other evidence or testimony in the case, outside of the testimony of the said Benny Valentine tending to connect the defendant with the offense committed."

During closing, counsel for the defense argued in part,

Ali Ghanbari, under the law, is guilty of the law of parties.

. . . .

But the evidence under the law of parties is clear, but it's not this version the State's going to give you that Ali Ghanbari is the mastermind and he's taken advantage of [Onyeuku] and Benny Valentine's trying to talk someone out of it.

Ali Ghanbari is 19 years old, and he's an idiot, just like Robert Brady and Sawyer Levit; doing drugs and making really stupid decisions.

That's the whole theme in this case.

He is guilty, and you'll find him guilty; and then you're going to get to hear additional punishment evidence in this case.

And then you'll get to consider the real issue related to every one of what's the appropriate punishment.

The State argued in part,

[T]his defendant and [Onyeuku] are the only major contributors of the DNA on that gun.

Even if you want to set all of that aside, you have him aiding and encouraging and planning and providing the weapons. And that is all you need.

We never said that this defendant, 19 years old at the time, was taking advantage of anyone.

We know beyond a reasonable doubt that [Onyeuku] was a 29-year-old man making his own decisions. All we said was that he had a motive for it, just as this defendant had the motive for it.

Ali is the only person that provides the motive and the opportunity in this case.

Nobody else Robert Brady [sic]; only Ali did.

[Onyeuku] had a motive to get that money that Ali promised him, but Ali had the motive to set it up.

And that's all you need to find him guilty.

–11–

The jury found appellant guilty of aggravated robbery "as charged in the indictment." Following the jury's punishment assessment, appellant filed a motion for new trial, which was denied. Appellant timely appealed.

Prior to this appeal's submission, appellant filed a motion in this Court "to abate this appeal and to remand this case to the trial court for a hearing to determine whether a new trial is warranted" because of the missing portions of the reporter's record. This Court abated the appeal, ordered the trial court to conduct a hearing and make "written findings and recommendations" respecting the "lost or destroyed portion" of the record, the trial court did so, and we reinstated this appeal.

## II. SUFFICIENCY OF THE EVIDENCE

When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (review of "all of the evidence" includes evidence that was properly and improperly admitted). "The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies, and the reviewing court must not usurp this role by substituting its own judgment for that of the jury." *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (citing *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012)). "The duty of the reviewing court is simply to ensure that the evidence presented supports the jury's verdict and that the State has presented a legally sufficient case of the offense charged." *Id*. "We will uphold the verdict unless a rational fact-finder must have had reasonable doubt with respect to any essential element of the offense." *Wilson v. State*, 448 S.W.3d 418, 425 (Tex. Crim. App. 2014).

Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Zuniga*, 551 S.W.3d at 733; *see also Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) ("[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them."). We presume the fact-finder resolved any conflicting inferences from the evidence in favor of the verdict and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In analyzing the sufficiency of the evidence, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Zuniga*, 551 S.W.3d at 733.

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14. But "testimony elicited from a witness called by the accused and offered by the accused is not accomplice-witness testimony which must be corroborated as contemplated under Article 38.14." *Johnson v. State*, 853 S.W.2d 527, 530–31 (Tex. Crim. App. 1992) (en banc) (quoting *Selman v. State*, 807 S.W.2d 310, 311 (Tex. Crim. App. 1991) (en banc)); *accord Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998) (en banc).

A person commits aggravated robbery if he uses or exhibits a deadly weapon in the course of a robbery. TEX. PENAL CODE § 29.03(a)(2); *see also id*. § 29.02(a)(2) (person commits robbery if in course of committing theft he intentionally or knowingly threatens or places another in fear

–13–

of imminent bodily injury or death). "A party is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). Further, a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). To determine whether a person is a party to an offense, we may look to events occurring before, during, and after the commission of the offense, and we may consider circumstantial evidence. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012).

In his first issue, appellant contends "the evidence was legally insufficient to prove that Appellant committed Aggravated Robbery under both the *Jackson*-standard and the accomplice-testimony standard." Specifically, appellant asserts (1) "the sole witness . . . identified by the police as having any personal knowledge of Appellant's participation in the Brady-incident was Valentine," who "was positioned to lie" and whose testimony must be corroborated pursuant to the accomplice-witness rule; (2) "the details of the Brady-incident depended on Brady's ability to accurately describe the event," but Brady "admitted that he had repeatedly lied to the police about details"; (3) the State's argument that appellant shared in planning the offense was based on "supposition" and "inconclusive" text messages; (4) "there was no evidence showing that Appellant caused or knew Onyeuku would be armed with the 38-Special"; (5) because a portion of Burch's DNA testimony is missing from the record, "this Court should exclude Burch's testimony in its entirety" for purposes of the sufficiency analysis; and (6) "when the Court eliminates Valentine's testimony and disregards the DNA-testimony, there is no evidence that tends to connect Appellant to an aggravated robbery."

Because the defense called Valentine, his testimony is "not accomplice-witness testimony which must be corroborated as contemplated under Article 38.14." *Johnson*, 853 S.W.2d at 530;

*Blake*, 971 S.W.2d at 454. But even if we eliminate Valentine's testimony from consideration, the remaining evidence demonstrates: (1) appellant was unhappy with Brady for not purchasing more marijuana from him; (2) appellant told Levit he planned to rob Brady at his apartment; (3) appellant and Onyeuku exchanged text messages about a plan to "hit that lick"; (4) appellant asked Isaac via text how Brady knew "im jacking him"; (5) Erwin found appellant's phone in Onyeuku's car and was told by a caller not to give it to police; (6) in phone calls to his father from jail, appellant stated a "boy" had shot and killed someone and appellant was "at his house" and "escaped"; (7) upon his arrest, appellant denied knowing Onyeuku despite other evidence showing they were acquainted; and (8) the two guns found at the scene had been stolen from appellant's cousin. This remaining evidence "tends to connect" appellant with the commission of the offense. *See Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008); *Medrano v. State*, 421 S.W.3d 869, 883 (Tex. App.—Dallas 2014, pet. ref'd); *see also Walker v. State*, No. 06-15-00136-CR, 2016 WL 1600268, at *3–4 (Tex. App.—Texarkana Apr. 21, 2016, pet. ref'd) (mem. op., not designated for publication) (defendant's text messages sufficiently corroborated accomplice-witness testimony in robbery case). Thus, Valentine's testimony was sufficiently corroborated.

Additionally, the evidence shows (1) while in Onyeuku's car just before the incident, appellant spoke with Onyeuku about "the plan" and "handed [Onyeuku] something"; (2) at the time of the shooting, Onyeuku was likely armed with a .38 caliber revolver reported stolen from appellant's cousin; and (3) appellant was a possible "major contributor" respecting the DNA on the .38-caliber revolver.[4] We conclude the evidence, viewed in the light most favorable to the verdict, supports reasonable inferences that appellant aided in committing aggravated robbery and

---

[4] The reporter's record's incompleteness is specifically addressed below in the analysis pertaining to appellant's fifth issue. As described above, our sufficiency review includes evidence that was properly and improperly admitted, though there is no suggestion the DNA evidence was inadmissible. *See Balderas*, 517 S.W.3d at 766.

knew Onyeuku was armed. *See Zuniga*, 551 S.W.3d at 733; *Hooper*, 214 S.W.3d at 16. Therefore, the evidence is sufficient to support appellant's conviction. *See Jackson*, 443 U.S. at 319.

### III. LOST PORTION OF REPORTER'S RECORD

An appellant is entitled to a new trial "(1) if the appellant has timely requested a reporter's record; (2) if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed or—if the proceedings were electronically recorded—a significant portion of the recording has been lost or destroyed or is inaudible; (3) if the lost, destroyed, or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution; and (4) if the lost, destroyed or inaudible portion of the reporter's record cannot be replaced by agreement of the parties." TEX. R. APP. P. 34.6(f). The Texas Court of Criminal Appeals has stated,

> Rule 34.6(f)(3) specifies that a new trial may be granted only if the missing portion of the record "is necessary to the appeal's resolution." That provision is itself a harm analysis. If the missing portion of the record is not necessary to the appeal's resolution, then the loss of that portion of the record is harmless under the rule, and a new trial is not required. In enacting that provision of the rule, we necessarily rejected the contention that a missing record could never be found unnecessary to an appeal's resolution.

*Issac v. State*, 989 S.W.2d 754, 757 (Tex. Crim. App. 1999). "We do not require a defendant to prove actual error, only to identify some particular error that the missing record could potentially assist with in his appeal." *Foster v. State*, 525 S.W.3d 898, 908 (Tex. App.—Dallas 2017 pet. ref'd).

If the dispute arises after the reporter's record has been filed in the appellate court, that court may submit the dispute to the trial court for resolution. TEX. R. APP. P. 34.6(e)(3). If the parties cannot agree on whether or how to correct the reporter's record so that the text accurately discloses what occurred in the trial court, the trial court must—after notice and hearing—settle the dispute. TEX. R. APP. P. 34.6(e)(2).

We review a trial court's denial of a motion for new trial for an abuse of discretion. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014); *Tyler v. State*, No. 05-05-01378-CR, 2008 WL 2738012, at *3 (Tex. App.—Dallas Jul. 15, 2008, pet. ref'd) (not designated for publication) (applying abuse of discretion standard in reviewing trial court's denial of request for new trial following rule 34.6(f) hearing). "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). A trial court abuses its discretion if no reasonable view of the record could support the trial court's ruling. *Colyer*, 428 S.W.3d at 122.

Appellant's counsel on appeal did not participate in the trial. At the trial court hearing during this appeal's abatement, appellant's trial counsel did not testify, and the record contains no explanation for this failure, despite the opportunity we gave appellate counsel at oral argument by directly asking why trial counsel failed to testify. Appellant's counsel on appeal introduced an affidavit in which court reporter Sheri Vecera stated that the portion of the record pertaining to proceedings from 9:32 a.m. through 9:50 a.m. on February 16, 2017, "is irretrievably lost due to no fault of the appellant." Also, appellate counsel argued in part (1) "during closing arguments [trial] counsel appeared to have . . . made a judicial admission regarding my client's involvement in the aggravated robbery"; (2) "[w]hat's not clear to me is was that admission correct based on . . . the missing evidence"; (3) "if it's not . . . , I have a potential ineffective counsel claim"; (4) one of the issues on appeal is whether appellant had "knowledge that a weapon was going to be used in this case"; and (5) "as far as . . . the DNA testimony regarding whether my client's DNA was on the gun," "we cannot know . . . how or whether [trial] counsel impeached Burch's purported conclusions."

During that hearing, the State presented the testimony of Calli Bailey, the lead prosecutor at trial. Bailey testified she reviewed (1) her personal notes "from during testimony" and

(2) portions of the record, including Burch's testimony and the parties' closing arguments. According to Bailey, Burch was the final witness called by the State and, following Burch's cross-examination, there was no redirect examination by the State. Bailey wrote only two notes regarding Burch: (1) a quote of Burch's conclusion that neither Onyeuku nor appellant could be excluded as contributors of the DNA found on the .38-caliber revolver and (2) a note from cross-examination that DNA could not show recency or frequency. Bailey stated she remembered that the subject of part of the missing testimony was defense counsel entering into evidence Defense Exhibit 45, which consisted of U.S. Census Bureau population statistics. That exhibit is in the record. Also, Bailey testified (1) the defense was "using those statistics to have Ms. Burch, in a sense, explain how the larger statistics in our report could be applied to a small portion of Collin County that would have applied to defendant"; (2) Burch did not retreat from the statistics she had testified to on direct examination; (3) defense counsel did not impeach Burch with "anything else"; (4) Bailey would have remembered "any untoward events" that occurred during the missing eighteen-minute period in question; and (5) she does not recall defense counsel "mentioning DNA during the closing arguments." On cross-examination, Bailey acknowledged she could not state all the questions asked of, and answers given by, Burch. Appellate counsel presented no evidence rebutting Bailey's testimony.

During closing at that hearing, appellate counsel argued in part "although the State's position is that the DNA evidence didn't have—wasn't central to their case, it could have been central to the defense case. The problem is without knowing what's in there, we won't know." The trial court's written findings of fact included a finding that appellant "has failed to establish that the lost portion of the record is necessary to the appeal."

In his fifth issue, appellant contends rule 34.6(f) entitles him to a new trial because "the lost records are necessary to this appeal's proper resolution." Additionally, appellant contends we

should disregard Bailey's testimony because "she did not have the capacity of recollection and narration and thus was not competent to testify on the critical issues before the Court."

The record does not show appellant asserted this "competency" complaint in the trial court. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (citing TEX. R. APP. P. 33.1(a)(1)(A); *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986) (point of error on appeal must comport with objection made at trial)). Therefore, that complaint presents nothing for this Court's review. *See id.*; *Baldit v. State*, 522 S.W.3d 753, 762 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (competence of witness is generally waived when witness is permitted to testify without objection). Even so, Bailey was plainly competent to testify. Any defects in her memory or notes go only to the weight a fact-finder should give her testimony.

As described above, the record contains the State's full direct examination of Burch and the first nine minutes of appellant's cross-examination, which includes an attempt by the defense to impeach Burch's conclusions. The lost portion of the record did not include "the entirety of the cross-examination" of Burch, but rather eighteen minutes of that cross-examination. At least part of that time involved the presentation of Defense Exhibit 45, which is in the record. The State did not conduct any redirect examination of Burch and trial counsel never mentioned the DNA testimony during closing. Further, at the trial court hearing during this appeal's abatement, appellant presented no witnesses. Nothing in the record shows how the lost portion of testimony was necessary to the appeal's resolution. *See Issac*, 989 S.W.2d at 757. On this record, we conclude the trial court did not abuse its discretion by not granting appellant a new trial based on rule 34.6(f). *See id.*

### IV. DENIAL OF MOTIONS TO SUPPRESS CELLPHONE EVIDENCE

We review a trial court's denial of a motion to suppress under a bifurcated standard of review. *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017); *Turrubiate v. State*, 399

S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for abuse of discretion and review the trial court's application of the law to the facts de novo. *Turrubiate*, 399 S.W.3d at 150. We uphold the trial court's ruling if supported by the record and correct under any theory of law applicable to the case, even if the reason provided by the trial court is wrong. *See Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Almost total deference should be given to a trial court's determination of historical facts, especially those based on an evaluation of witness credibility or demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012).

"No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." CODE CRIM. PROC. art. 38.23(a). Article 38.23 applies to illegal searches or seizures conducted by law enforcement officers or "other persons," even when those private individuals are not acting in conjunction with, or at the request of, government officials. *Miles v. State*, 241 S.W.3d 28, 36 (Tex. Crim. App. 2007).

A search warrant is "a written order, issued by a magistrate and directed to a peace officer, commanding him to search for any property or thing and to seize the same." CODE CRIM. PROC. art. 18.01(a). A search warrant must be based on probable cause as determined from a sworn affidavit. *See id*. art. 18.01(b). "Probable cause exists if, under the totality of the circumstances, there is fair probability that contraband or evidence of a crime will be found at a specified location." *State v. Cuong Phu Le*, 463 S.W.3d 872, 878 (Tex. Crim. App. 2015). "It is a flexible,

non-demanding standard." *Id*. A magistrate's decision to issue a search warrant is subject to a deferential standard of review, even in close cases. *State v. Elrod*, 538 S.W.3d 551, 556 (Tex. Crim. App. 2017). We will therefore uphold a magistrate's decision to issue a search warrant "so long as he or she has a substantial basis for concluding" that probable cause exists. *Id*. at 557.

A valid search warrant must sufficiently describe the place to be searched. *See Green v. State*, 799 S.W.2d 756, 757 (Tex. Crim. App. 1990). When the affidavit in support of the search warrant is incorporated into the warrant, the two are considered together in defining the place to be searched, "but the description in the affidavit controls over the language in the warrant itself." *Long v. State*, 132 S.W.3d 443, 446 n.11 (Tex. Crim. App. 2004); *see also Strange v. State*, 446 S.W.3d 567, 573 (Tex. App.—Texarkana 2014, no pet.) (determining scope of search warrant by examining affidavit incorporated therein). Further, when courts interpret affidavits and search warrants they "must do so in a common sense and realistic fashion and avoid hypertechnical analysis." *Faulkner v. State*, 537 S.W.2d 742, 744 (Tex. Crim. App. 1976) (citing *United States v. Ventresca*, 380 U.S. 102 (1965)); *see also Elrod*, 538 S.W.3d at 556 (magistrate may use logic and common sense to make inferences based on facts in affidavit).

### A. Cellphone Extraction Evidence

We begin by addressing appellant's motion to suppress the cellphone extraction evidence. Appellant's arguments in the trial court respecting that motion included (1) the search warrant failed to describe the evidence sought and did not incorporate the affidavit by reference; (2) the affidavit lacked a sufficient nexus between the cellphone and the offense, and (3) the "personal writings" on the phone required more than a "mere evidence search warrant."

At the pretrial hearing on that motion to suppress, the State introduced into evidence a certified copy of the search warrant, which was dated November 21, 2012, and had an affidavit of Pfahning stapled to it. The search warrant referenced "the Affidavit attached hereto" and stated

–21–

"said Affidavit is here now made a part hereof for all purposes." Also, the search warrant stated

"you are commanded to enter the suspected place and premises described in said Affidavit and to

there search for the personal property described in said Affidavit."

The affidavit described the "place and premises" as the Plano Police Department and stated

in part,

> There is at said suspected place and premises personal property concealed and kept and subject to seizure under the laws of Texas and described as follows:
>
> Property or items constituting evidence of a criminal offense or relating to a criminal offense to wit:
> Cellular phone identified as:
> A black T-Mobile Android Prism (IMEI#860399011671133) (phone# 806-471-8260)
>
> Note: A cellular phone is described as an electronic device used to make cellular telephone calls across a wide geographic area. . . . In addition to functioning as a telephone, a modern cellular phone typically supports additional services such as SMS messaging, MMS, e-mail and Internet access . . . .
> . . . .
> During this examination the following data will be attempted to be extracted:
> • Call logs, to include incoming, outgoing and missed calls
> • Phonebook and contacts to include phone numbers, and e-mail addresses.
> • SMS/MMS messages and attached multimedia files, to include incoming and outgoing.
> . . . .
> Wherefore, Affiant asks for the issuance of a warrant that will authorize him to . . . conduct the forensic examination performed on the aforementioned item until such examination is complete.

Additionally, the affidavit stated the affiant "has probable cause for said belief" based on "facts

and circumstances" learned from his investigation of a November 21, 2012 "burglary and death"

at a Plano apartment.[5] After denying the motion to suppress the cellphone extraction evidence, the trial court issued written findings of fact and conclusions of law.[6]

In his second issue on appeal, appellant contends the trial court erred "by not excluding the information extracted by the police from Appellant's cellphone, which under Art. 38.23(a) due to the violation of three laws of Texas combined to make: (1) the search of the phone unreasonable, (2) the information unlawfully obtained, and (3) the evidence subject to the exclusionary rule." Specifically, appellant argues (1) the cellphone "was unlawfully obtained by the police" from Erwin, who "exercised control over the phone and accessed its data without the consent of the owner contrary to the tort of conversion and Tex. Penal Code § 33.02(a)"; (2) the warrant did not authorize the extraction of electronically stored information; (3) the warrant affidavit did not satisfy the requirements of an evidentiary search warrant; and (4) the text messages extracted from his cellphone constituted "personal writings," which are excluded in an evidentiary search warrant.

---

[5] Those "facts and circumstances" were stated in the affidavit as follows:

Robert Brady, a resident of the apartment, shot and killed Onyeuku after he threw a rock through the patio door and entered the apartment with a handgun. . . . Brady saw the second male flee over the patio wall . . . .

During the investigation, Affiant learned from Officer Harbor he received a phone call from Tiaira Erwin about the shooting. Erwin is Onyeuku's fiance. Erwin told Officer Harbor she received a phone call from "BJ's mom" (later identified as Kimberly Lessley) who stated Onyeuku had been shot. Erwin knows BJ to be a friend of Onyeuku and BJ were with Onyeuku during the day. Erwin also told Officer Harbor she contacted Lessley and retrieved Onyeuku's vehicle and phone.

Detective Chaney contacted Erwin at the Plano Police Department. Affiant watched the interview and observed Erwin hand Det. Chaney a black iPhone and a black Android phone. Erwin told Det. Chaney the iPhone belonged to Onyeuku. Erwin received the iPhone from Lessley and Lessley told Erwin not to give the phone to the police and not to call the police about anything. Erwin also received the black Android phone from Lessley. Erwin told Det. Chaney she did not know who the phone belonged to so she started calling numbers on the phone to find out. Erwin found out the phone belonged to someone named "Ali". According to Erwin, she did not know "Ali" so she went through the phone to find out. Erwin was not sure at the time where Onyeuku was and she was trying to find out who he had been with. As Erwin was looking through the text messages on "Ali's" phone and she found a text message from him to Onyeuku stating something like "You ready to hit a lick." Affiant has worked burglary and robbery cases and through his training and experience knows the term "hitting a lick" to mean committing a burglary or robbery. Erwin was able to contact "Ali" and he told Erwin not to give the phone to the police. Erwin told Ali she was at the police station and wanted to know where Onyeuku was. "Ali" told her not to give the phone to the police again. Det. Chaney seized both the iPhone and the black Android phone for evidence during the interview.

Based on the information contained above in this affidavit, Affiant has probable cause to believe that information contained on the black Android phone is directly related to the burglary and death investigation.

[6] The trial court's findings of fact stated in part that Pfahning's affidavit established (1) "[a] burglary was committed in Plano on November 21, 2012, resulting in the death of one of the suspects, Chinedu Onyeuku"; (2) appellant's black Android phone was "brought to Plano Police Department by Onyeuku' s fiancée, Tiaira Erwin"; (3) Erwin discovered a text message from the phone to Onyeuku prior to turning the phone over to police that read: "You ready to hit a lick"; and (4) "[i]n Detective Pfahning's training and experience, 'hitting a lick' means committing a burglary or robbery, indicating that Defendant and Onyeuku communicated via cell phone prior to November 21st, planning to commit a burglary or robbery."

–23–

Appellant's first argument, that Erwin unlawfully "exercised control over the phone and accessed its data without the consent of the owner," is asserted for the first time on appeal. Therefore, that argument presents nothing for this Court's review. *See Clark,* 365 S.W.3d at 339; TEX. R. APP. P. 33.1(a)(1)(A). Even so, he abandoned the phone in the car and without a passcode to protect it. *See Matthews v. State*, 431 S.W.3d 596, 608–09 (Tex. Crim. App. 2014). At the least, he left it where Valentine could access it, Valentine later took the car to his mother's house, and he left the car accessible at the least to his mother and whomever she allowed access to it.

Next, we address appellant's argument that the warrant did not authorize the extraction of electronically stored information. Appellant contends (1) "the warrant authorized only a 'search for the personal property described in said Affidavit'"; (2) "[t]he personal property was described in these terms: 'Property or items constituting evidence of a criminal offense or relating to a criminal offense'"; (3) "[t]his was overly broad and encouraged a general search"; and (4) "[m]oreover, this description would not seem to cover so-called 'electronic discovery' or looking for 'electronically stored information.'" But the record shows the "personal property" was described in the affidavit as: "Property or items constituting evidence of a criminal offense or relating to a criminal offense to wit: Cellular phone identified as: A black T-Mobile Android Prism (IMEI#860399011671133) (phone# 806-471-8260)." Additionally, the affidavit requested "the issuance of a warrant that will authorize [affiant] to . . . conduct the forensic examination performed on the aforementioned item until such examination is complete" and specifically described the data that would "be attempted to be extracted." The trial court did not err by concluding the warrant authorized the extraction of electronically stored information. *See Faulkner*, 537 S.W.2d at 744.

Appellant's third argument is that the warrant affidavit did not satisfy the requirements for an evidentiary search warrant. Specifically, appellant asserts in part,

The existence of a message referring to "a lick" on a phone is **no** indication that the "lick" was related to a **specific known crime**. The tie between the phone (or its surmised ESI) and the crime was too tenuous. At most, the statement by Erwin about her discovery of a single text message could provide **no** more than a hunch that there would be information related to the home invasion at the Brady apartment found on the phone. Erwin's report that she believed the message had been sent to Onyeuku was **not** enough especially when the timing of the message was unknown.

**Nor** did the fact that the owner of the phone had instructed Erwin **not** to allow access to the phone by police provide any further connection to Brady-incident. That person never stated any reason for his desire to maintain his right of privacy in the phone.

The affidavit established (1) both phones were given to Erwin by Lessley soon after the robbery in which Onyeuku was shot; (2) a second male had fled the robbery scene; (3) Onyeuku had communicated with Ali about committing a robbery; and (4) Erwin had been told not to call police and not to give the Android phone to police. Based on the contents of the affidavit, the magistrate could have reasonably inferred that the black Android cellphone contained communications relating to preparations for the robbery in which Onyeuku was shot. *See Elrod*, 538 S.W.3d at 556 (magistrate may use logic and common sense to make inferences based on facts in affidavit). Thus, the magistrate had a substantial basis for concluding probable cause existed. *See id.* at 557. We conclude the trial court did not err by concluding the affidavit satisfied the requirements for an evidentiary search warrant. *See id.* at 556 (magistrate's decision to issue search warrant is subject to deferential standard of review, even in close cases); *see also Cuong Phu Le*, 463 S.W.3d at 878 (probable cause "is a flexible, non-demanding standard").

As to appellant's fourth argument, the code of criminal procedure provides that a search warrant may be issued to search for and seize "property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense." CODE CRIM. PROC. art. 18.02(a)(10). "Personal writings refer to writings like diaries, memos, or journals that were not intended by the writer to be published to third parties." *Hokashi-Mechalith v. State*, Nos. 05-16-01520-CR & 05-16-01521-

CR, 2018 WL 3078683, at *2 (Tex. App.—Dallas Jun. 20, 2018, no pet.) (mem. op., not designated for publication) (citing *Mullican v. State*, 157 S.W.3d 870, 873 (Tex. App.—Fort Worth 2005, pet. ref'd)). "It is the appellant's intent that is important to our inquiry." *Id.* (citing *Cavazos v. State*, No. 05-05-01352-CR, 2006 WL 3042130, at *10 (Tex. App.—Dallas Oct. 27, 2006, pet. ref'd) (not designated for publication)). "[W]hether the document is easily accessible to others is a factor in determining whether it is a personal writing." *Id.*

Appellant's text messages show they were intended as ongoing communication between at least two people and thus are not "writings like diaries, memos, or journals." The very nature of a text message is that it goes to another person. We conclude the trial court did not err by not concluding appellant's text messages constituted "personal writings" excluded from the search warrant. *See id.*; *see also Cavazos*, 2006 WL 3042130, at *10 (letters written by appellant that were found on table at his residence "stamped, sealed, addressed, and ready to be mailed" were not "personal writings" excluded by art. 18.02(a)(10)); *Langley v. State*, No. 03-08-00722-CR, 2010 WL 1632700, at *2 (Tex. App.—Austin Apr. 23, 2010, pet. ref'd) (mem. op., not designated for publication) ("a writing does not qualify as a 'personal writing' within the meaning of article [18.02(a)(10)] if its author intends that it be read by others").

### B. Electronic Customer Data from Cellphone Service Providers

In his fourth issue, appellant contends the trial court erred by not excluding "electronic customer data" provided by court order from cellphone service providers "AT&T Wireless" and "T-Mobile USA Wireless." According to appellant, the State "did not directly utilize" that information as evidence at trial, but "because it was essential the police gain that information to know who to arrest and to prove the relevance of the text messaging they had withdrawn from the [black Android] cellphone, the record reflects that the fruits of the search at issue **were used against Appellant**."

Under the "fruit of the poisonous tree" doctrine, evidence may not be used against a criminal defendant when it was obtained by an illegal search or seizure and not by means sufficiently distinguishable to be purged of the primary taint. *Crayton v. State*, 485 S.W.3d 488, 501 (Tex. App.—Texarkana 2016, no pet.) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Thornton v. State*, 145 S.W.3d 228, 232 (Tex. Crim. App. 2004)). But the erroneous overruling of a motion to suppress evidence is not reversible error if the fruits of the search were not admitted into evidence at trial. *Dillard v. State*, 550 S.W.2d 45, 54 (Tex. Crim. App. 1977); *see also Baker v. State*, 956 S.W.2d 19, 22 (Tex. Crim. App. 1997) ("where evidence obtained as a result of an interrogation has not been used, the appellate court need not entertain a complaint attacking admissibility of that evidence").

As described above, the extraction search warrant for the black Android cellphone was dated November 21, 2012. The sworn "Return and Inventory" shows police executed it that same date. Further, Caballero testified that after receiving the black Android phone from Erwin, he and other detectives started "running the name and the phone number through open source databases, public databases, internet databases" to "learn[] who this name and phone number came back to" and "that's how we learned the identity of Ali Ghanbari." Police learned appellant's identity by independent legal means.

Police obtained the court orders of which appellant complains on November 27, 2012—six days after they executed the extraction search warrant. Thus, police obtained appellant's identity and the text messages admitted at trial by independent legal means. Because the record does not show any "fruits of the search at issue" were admitted into evidence at trial, there is no reversible error respecting appellant's motions to suppress electronic customer data from service providers. *See Dillard*, 550 S.W.2d at 54.

## V. JURY CHARGE ERROR

In felony cases, the trial court is required to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." CODE CRIM. PROC. art. 36.14. We review alleged jury charge error in two steps. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). First, we determine whether error exists in the charge. *Id*. Second, if charge error exists, we review the record to determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). Where, as here, the defendant did not raise a timely objection to the jury instructions, "reversal is required only if the error was fundamental in the sense that it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015).

Error is egregiously harmful if it "affect[s] the very basis of the case, deprive[s] the defendant of a valuable right, or vitally affect[s] a defensive theory." *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013). When analyzing harm, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). The defendant must have suffered "actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

In his third issue, appellant contends the trial court "erred by failing to inform the jury that before they could find Appellant guilty as a party to Onyeuku, the jury must find beyond a reasonable doubt that Appellant knew that Onyeuku was armed." According to appellant, (1) "[t]he jury should have been instructed that if they found Onyeuku was the person brandishing a firearm and alarming Brady, in order to find Appellant guilty of *aggravated* robbery they had to believe

he knew Onyeuku was armed"; (2) "the trial court clearly erred in failing to include that information distinctly in the charge, apart from the instruction about determining the specific intent to promote or assist the commission of the offense by the acts of another"; (3) "[t]he instruction given did **not** meet the fundamental purpose of informing the jury clearly and succinctly of the role it was to play or the decisions it must make"; and (4) "there is **no** evidence that Appellant was present with his alleged 'companions' at the time of the aggravated robbery or 'aided or attempted to aid them in the commission of the offense." Appellant asserts he was egregiously harmed because "[t]his error deprived [him] of his right to a fair trial and made the verdict meaningless."

"If the use of a deadly weapon is an element of the charged offense and is alleged in the indictment, and the jury finds the defendant guilty as alleged in the indictment, then that finding necessarily supports entry of an affirmative finding in the use or exhibition of a deadly weapon in the judgment." *Hatch v. State*, No. 05-13-01710-CR, 2015 WL 4723620, at *7 (Tex. App.—Dallas Aug. 10, 2015, pet. ref'd) (mem. op., not designated for publication) (citing *Sarmiento v. State*, 93 S.W.3d 566, 570 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd)). Courts have applied that principle to party liability:

> [E]ven as a party, a defendant cannot be convicted unless his participation is accompanied with the intent "to promote or assist the commission of the offense." The offense here was aggravated robbery, and the use of a deadly weapon was alleged in the indictment as an element of the offense. Thus, before jurors were authorized to find appellant guilty, even as a party, they first had to believe beyond a reasonable doubt that appellant knew a deadly weapon would be used in the commission of the offense. By its verdict, the jury necessarily made the factual finding to support the entry of an affirmative finding of the use or exhibition of a deadly weapon upon the judgment.

*Sarmiento*, 93 S.W.3d at 570 (citations omitted); *accord Hatch*, 2015 WL 4723620, at *7.

Appellant contends *Sarmiento* and *Hatch* provide no guidance in this case because he is not arguing "whether the jury needed to be asked to make an express finding about use of a deadly weapon." But under the reasoning of *Sarmiento* and *Hatch*, the charge imposed the same restriction

appellant contends the trial court "failed" to impose—that the jury could not find appellant guilty as a party unless it found beyond a reasonable doubt that appellant knew Onyeuku was armed. The indictment alleged the use of a firearm as an element of the offense. The charge asked the jury whether appellant, "acting with *intent to promote or assist the commission of the offense*," "solicited, encouraged, directed, aided or attempted to aid Benny Valentine or Chinedu Onyeuku." (emphasis added). "Thus, before jurors were authorized to find appellant guilty, even as a party, they first had to believe beyond a reasonable doubt that appellant knew a deadly weapon would be used in the commission of the offense." *Sarmiento*, 93 S.W.3d at 570; *accord Hatch*, 2015 WL 4723620, at *7. That restriction is clear from the plain language of this charge, and thus we conclude there was no charge error.

In any event, the record does not show egregious harm to appellant from the absence of the deadly weapon instruction he describes. According to appellant, "(1) the entire jury charge was defective because Appellant could have been liable only as a party (he was not at the scene of the Brady-incident); (2) the evidence overall was weak connecting Appellant to the Brady-incident; [and] (3) the State relied heavily on party liability in this case." But the evidence shows: (1) appellant told Levit he planned to rob Brady at his apartment; (2) appellant and Onyeuku exchanged text messages about a plan to "hit that lick"; (3) the two guns found at the scene had been stolen from appellant's cousin; (4) while in Onyeuku's car just before the incident, appellant spoke with Onyeuku about "the plan" and "handed [Onyeuku] something"; (5) at the time of the shooting, Onyeuku was armed with the .38-caliber revolver stolen from appellant's cousin; (6) appellant was a possible "major contributor" respecting the DNA on that revolver; and (7) in phone calls to his father from jail, appellant stated a "boy" had shot and killed someone and appellant was "at his house" and "escaped."

Also, during voir dire, the prosecutor explained the law of parties by describing a hypothetical robbery committed by two persons in which the person acting as the "lookout" did not have a gun and was unaware the other person did. The prosecutor stated that the lookout

> would not be committing aggravated robbery because they are not—they are not promoting the actual offense that's being committed, okay? That's a certain amount of knowledge what the offense is in order for this person to be guilty and on the hook for what this person did.

. . . .

> [W]e have to prove they acted with intent to—to further the commission of the actual offense that was committed, okay?

Finally, during closing, defense counsel argued to the jury that appellant was guilty of the charged offense. That offense was aggravated robbery. The defense did not request, and the charge did not contain, an instruction on the lesser-included offense of robbery. Based on "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole," we conclude the jury charge error alleged by appellant did not result in sufficient harm to warrant reversal. *See Nava*, 415 S.W.3d at 298; *Almanza*, 686 S.W.2d at 171.

## VI. CONCLUSION

We decide against appellant on his five issues and affirm the trial court's judgment.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
170257F.U05

–31–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ALI L. GHANBARI, Appellant

No. 05-17-00257-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 199th Judicial District Court, Collin County, Texas
Trial Court Cause No. 199-81974-2013.
Opinion delivered by Justice Carlyle.
Justices Bridges and Partida-Kipness participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 17th day of April, 2019.