# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO.  03-24-00033-CR
NO.  03-24-00034-CR

The State of Texas, Appellant

v.

Manuel Gutierrez Torres, Appellee

FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
NOS. C-18-0137-SB & C-18-0860-SA,
THE HONORABLE BARBARA L. WALTHER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellee Manuel Gutierrez Torres was charged with two counts of assault family violence with a previous conviction, a third-degree felony enhanced to the punishment range for a second-degree felony.  *See* Tex. Penal Code § 22.01(b)(2)(A).  He filed a motion to dismiss the charges on speedy-trial grounds, which the trial court granted after a hearing.  *See* U.S. Const. amend. VI.[1]  On appeal, the State contends that the trial court misapplied the *Barker* factors to Appellee's speedy-trial claim and erred by judicially noticing a fact that was not in evidence.  *See Barker v. Wingo*, 407 U.S. 514, 530 (1972).  We affirm the trial court's order.

---

[1] *See Leachman v. Stephens*, 581 F. App'x. 390, 402 (5th Cir. 2014) (noting that Sixth Amendment right to speedy trial applies to States by incorporation under Due Process Clause of Fourteenth Amendment).

**BACKGROUND**

On February 1, 2018, Appellee was charged in trial court cause number C-18-0137-SB with one count of assault family violence, alleged to have occurred on November 15, 2017. He was charged with a second count involving the same victim, Juanita Velasquez, on September 6, 2018, in trial court cause number C-18-0860-SA; the second assault was alleged to have been committed on July 2, 2018. Appellee voluntarily surrendered himself to law enforcement on March 23, 2023. He posted bond and was released from jail the following day. The trial court appointed counsel for Appellee on June 1, 2023. Appellee filed his motion to dismiss on November 28, 2023, and the trial court held a hearing on the motion on December 15, 2023.

Both Appellee and the State presented testimony from members of law enforcement. Appellee also testified and called as witnesses Christina Ubando, the Tom Green County Clerk, and Tyler Johnson, the chief appraiser for the Tom Green County Appraisal District. Exhibits admitted during the hearing included a death certificate for Francisco Javier Ibarra, Appellee's former roommate and a potential witness to the alleged assaults; two booking sheets for Appellee; a 2018 article from the San Angelo Standard-Times; the incident report for the alleged July 2018 assault; and Appellee's parole records.

Appellee testified regarding his association with various San Angelo properties, his knowledge of law enforcement's investigation, and his parole. In 2017 and 2018, he lived at 1402 E. 18th Street with his roommate, Ibarra, who was present when the "alleged incidents happened." From 2017 until his arrest, Appellee was self-employed and worked in construction

2

and home remodeling; he had owned the residence "during this entire time."[2]  His mother and brother lived on the same street, and Appellee managed their properties as well.  Around 2021, Appellee moved in with his sick mother to care for her.  He rented out his residence but did not recall when he began to do so; his mother was "in charge of all that."

Appellee first became aware that a warrant had been issued for his arrest in March 2023, when family members sent him screenshots from the Concho Valley Crime Stoppers webpage, which offered a reward in connection with his apprehension.  He called the county jail and turned himself in.  From 2018 until 2023, no one affiliated with law enforcement had advised him that he was subject to an arrest warrant.  He had not seen the 2018 article in the Standard-Times, "Tom Green County Sheriff's Office 'Most Wanted' List," which gave a description of him and advised that he was "sought on suspicion of assault family/household member with previous conviction."

Appellee testified that he had not been on parole at the time of his arrest in 2023.  He was released from parole in 2017 and had not spoken with his parole supervisor in years because he had "completed it . . . with flying colors" and had reported at all times.

Of the eight current or former San Angelo Police Department officers who testified, only two described explicit attempts to contact Appellee during the almost six years between the first indictment and his arrest.  Officer Lee Kvittem testified that he had twice gone to 1402 E. 18th Street but could recall only the first instance, when he did not attempt to execute a warrant.  Instead, it was "pretty much a civil standby call on February 8, 2018," approximately a week after a grand jury returned the first indictment against Appellee, to assist a woman in

---

[2] Johnson testified that property records listed Appellee as the registered owner of 1402 E. 18th Street from 2017 through 2023.

retrieving her belongings from the residence. While at the residence, he spoke with the woman, whose name he could not recall. She gave him Appellee's phone number. Officer Kvittem called the number and could not recall whether he identified himself as law enforcement. He was unable to ascertain the identity of the person who answered the call. Because he could not do so, he did not allow the woman to take any property from the residence.

After attempting to refresh his recollection with a report that he had written, Officer Kvittem testified he had no independent recollection of the second time he responded to 1402 E. 18th Street but that the report stated that he had gone there on April 25, 2018, to speak with a woman named Linda Ortega about an arson threat made by Benito Cordero. Appellee testified at the hearing that he did not know Ortega.

The other attempt to contact Appellee was made by Detective Austin Covey, who testified that he had gone to Appellee's mother's house on January 20, 2020, "in regards to an attempt to locate a wanted subject." Detective Covey had received a notification that Appellee had an active arrest warrant and went to the address provided. He could not locate Appellee but spoke with his mother, who said that she had not seen him in years. During the hearing, Appellee testified that in January 2020, he saw his mother "every day."

Seven law enforcement witnesses were questioned concerning whether they had responded to Appellee's residence from 2017 until his arrest. Despite some of the officers attempting to refresh their recollections with their reports, few had independent recollections of going to the residence, and the details they provided were vague. Moreover, although Deputy Irma Rodriguez testified that if "there was a report, then I wouldn't doubt that I was there," other officers testified that the inclusion of their names in reports did not mean that they responded. For instance, Officer Zachary Villarreal testified that he did not know whether he

4

was "disregarded" and never went to the address or whether he showed up to assist and then left. Officer Jacob Beckwith similarly testified that the inclusion of his name meant only that "at one point, [h]e was attached to the call for service."

Only three of the officers could recall anything about being dispatched to 1402 E. 18th Street. Officer Nicholas Franchuk testified that he responded on July 2, 2018, and attempted unsuccessfully to make contact with an unknown person inside the residence. City Marshal Ray Rich, who had no memory of the call, testified that according to his report, he went to the address on June 4, 2019, "for court warrants" but "[a]pparently" did not see anyone. Marshal Rich worked for the municipal court but did not know who he was looking for on that date or who lived at the residence. Sergeant Chris Chappa testified that he only knew he had gone to the residence from reviewing his report, which showed that he had made a "call for service for an attempt to locate" on May 17, 2018. However, Sergeant Chappa testified that he was looking for a man named "Michael"; that he did not remember what he did at the location; and that he could have gone there to execute a warrant, issue a subpoena, find the parent of a lost child, or deliver a death notification.

Sergeant Cory Ruble, an investigator at the Tom Green County Jail, testified that he booked Appellee when he turned himself in on March 23, 2023. Appellee's 2023 booking sheet gave his residence as his mother's address. A booking sheet from 2013 listed the address at 1402 E. 18th Street. Sergeant Ruble testified that if an arrestee refused to provide an address, he would have recorded the address from the arrestee's records. He did not know how the information on Appellee's booking sheets was obtained.

5

Ubando, the county clerk, testified that her office had a death certificate for Ibarra dated March 3, 2023. Appellee testified that he would have turned himself in earlier had he known about the warrant for his arrest and that Ibarra would have been able to testify on his behalf.

The incident report for the alleged July 7, 2018 assault was prepared by Officer John Southwell, who did not testify at the hearing. He described responding to 1402 E. 18th Street and learning that an assault had occurred involving Appellee and Velasquez, who claimed that Ibarra had been present for the assault. Officer Southwell wrote that officers "made several attempts to make contact with Manuel Torres inside of the residence" by knocking on the front door and shouting but that in response, a television inside was "turned up louder." Officer Southwell noted that "[c]ontact was never made with Manuel, but according to a check in department records this is not the first incident where Manuel Torres has assaulted Juanita Velasquez and has then refused to speak with or cooperate with police."

Appellee's parole records showed that he was sentenced in 2012 to five years' confinement and released on parole in 2015. The last date on which his parole could terminate—his "maximum expiration date"—was given as July 26, 2018. The records reflected that on November 29, 2017, a decision was made to issue an arrest warrant for Appellee; the basis for the warrant was not given. An entry in the minutes for that date noted that he had been declared an absconder. However, an entry on April 11, 2023, stated that he was "CURRENTLY A PAROLEE" and indicated that his parole had been discharged through expiration.

The trial court granted Appellee's motion to dismiss and entered, in relevant part, the following written findings of fact and conclusions of law:

3. San Angelo Police Department (SAPD) dispatched officers on November 15, 2017, to an address located on East 18th St, San Angelo, Texas, after

6

receiving a call that an assault with possible family violence had occurred. Mr. Torres, defendant, was not interviewed by law enforcement.

4. San Angelo Police Department dispatched officers on July 2, 2018, to an address located on East 18th St, San Angelo, Texas, after receiving a call that an assault with possible family violence had occurred. A responding officer testified that he was told that Mr. Torres was inside the house but he did not interview him.

5. Both alleged assaults involved the same victim, Juanita Velasquez.

6. The State called several SAPD witness[es] dur[]ing the December 15, 2023, hearing. These witnesses testified that they remembered very few if any of the details relating to the events in question. Some witnesses for the State testified that it was possible that while the dispatcher's log might indicate that they had initially been dispatched to investigate the call[,] . . . they were redirected and . . . never were actually present on East 18th Street[.]

7. One officer testified that he had read the incident report and it said that he was the author of the report but he did not recall the event even after reading the report. The loss of the officers['] memory of the events surrounding the events will[/]would significantly impact the prosecution of this case.

8. When SAPD was dispatched to investigate the July 2, 2018[] incident[,] no officer attempted to enter the home located at the address. The evidence introduced at the hearing established that no effort was made to execute the outstanding arrest warrant that was issued in connection with Cause Number C-18-0137-SB for the defendant or that the officers even knew that there was an outstanding arrest warrant for Mr. Torres.

9. One witness for the State, testified that in 2020, he knocked on the door at 1322 E. 18th St., and that an individual claiming to be the defendant's mother answered the door and said she had not seen defendant in months. This was the only evidence introduced of any attempt made by law enforcement to execute the arrest warrants or to contact Defendant.

10. The State introduced evidence that Parole listed Defendant as an absconder, however the State did not introduce any evidence of any efforts that the Parole Division had made to locate Defendant and at the time of his surrender the Parole hold was withdrawn.

11. Defendant testified for the limited purpose of providing information relating to where he had been residing from 2017 until his surrender. He testified that he had lived at the same address and that he owned the houses located at 1322 E. 18th Street and 1402 E. 18th Street. Defense also introduce evidence that Defendant had owned both address[es] since 2017.

7

12. There was no evidence introduced that in the investigation of either event Mr. Torres was interviewed by law enforcement.

13. The evidence established that on March 3, 2023, Francisco Javier Ibarra died. Mr. Ibarra was the defendant's roommate when both alleged events occurred. Mr. Ibarra was a material witness.

14. Mr. Ibarra's testimony would have assisted the parties in the trial of these cases and the delay in arresting Mr. Torres has denied parties the benefit of this witness's testimony.

15. Several weeks after Mr. Ibarra's death a local new[s] organization listed Manuel Torres as being a fugitive. Several of Defendant[']s friends told Defendant that he was listed as being wanted by law enforcement. On March 23, 2023, defendant voluntarily surrendered to law enforcement.

16. The total time from the date of the offense charged in Cause Number C-18-0137-SB and Defendant's arrest is one thousand nine hundred fifty-four (1954) days.

17. The total time from the date of the offense charged in Cause Number C-18-0860-SA and Defendant's arrest is one thousand eight hundred seventy-seven (1877) days.

The court concludes that as a matter of law Mr. Torres's fundamental [c]onstitutional right[s] to a speed[y] trial which [are] found in the Sixth Amendment of the Constitution of the United States and Article 1, Section 10, of the Constitution of the State of Texas ha[ve] been violated by the State's inaction and the State's failure to execute in a timely manner the arrest warrants associated with the these indictments. In reaching this conclusion the court has reviewed applicable case law. In finding that the cases should be dismissed, the court has conducted the required balancing test and finds that Mr. Torres [has] been irreparabl[y] harmed by the delay because of the death of a witness and the los[s] of the officers['] memory of the events.

This appeal followed. *See* Tex. Code Crim. Proc. art. 44.01(a)(1) (authorizing State to appeal order dismissing indictment).

## DISCUSSION

### I. Speedy-Trial Violation

To determine whether a defendant was denied the right to a speedy trial, we consider the four non-exhaustive factors listed by the United States Supreme Court in *Barker v. Wingo*: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay. 407 U.S. at 530; *see Balderas v. State*, 517 S.W.3d 756, 767 (Tex. Crim. App. 2016). An appellate court must balance the factors "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Balderas*, 517 S.W.3d at 773 (quoting *Cantu v. State*, 253 S.W.3d 273, 283 (Tex. Crim. App. 2008)). The State bears the burden of justifying the length of the delay, while the defendant has the burden of proving his assertion of the right to a speedy trial and of showing prejudice. *State v. Davis*, 549 S.W.3d 688, 697 (Tex. App.—Austin 2017, no pet.) (citing *Cantu*, 253 S.W.3d at 280). The defendant's burden of proof on the third and fourth factors "'varies inversely' with the State's degree of culpability for the delay." *Cantu*, 253 S.W.3d at 280. Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.* at 280–81. None of the factors is a necessary or sufficient condition of finding a speedy-trial-right deprivation. *Barker*, 407 U.S. at 533. They are instead "related factors and must be considered together with such other circumstances as may be relevant." *Id.*

We apply a bifurcated standard when reviewing a trial court's ruling on a speedy-trial claim: we review factual components for an abuse of discretion and legal components de novo. *Sample v. State*, 653 S.W.3d 287, 292 (Tex. App.—Austin 2022, pet. ref'd) (citing *Cantu*,

9

253 S.W.3d at 282). The balancing test as a whole is a purely legal question that we review de novo. *Id.* We review the trial court's ruling in light of the arguments, information, and evidence that was available to the court when it ruled. *Id.* (citing *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003)). We view the evidence in the light most favorable to the trial court's ruling and defer to both the trial court's resolution of disputed facts when supported by the record as well as the reasonable inferences drawn from those facts. *Cantu*, 253 S.W.3d at 282; *Sample*, 653 S.W.3d at 292.

In its first issue, the State contends that the trial court erred in its application of the *Barker* factors. Although the State concedes that the length of delay was presumptively prejudicial, it argues that Appellee was responsible for the delay and dilatory in asserting his right and that Ibarra's testimony might have been inculpatory. Appellee responds that the State failed to justify the delay, which resulted wholly from its negligence; that he timely asserted his right on learning of the arrest warrants' existence; and that he was prejudiced by the loss of Ibarra's testimony as well as the extent of memory loss evidenced at the hearing.

A. **Length of Delay**

In a pretrial appeal from an order dismissing a prosecution on speedy-trial grounds, the length of delay is measured from an accusation against a defendant—the earlier of the defendant's arrest or the presentment of an indictment or information against him—to the date of the hearing on the speedy-trial motion. *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999). *But see State v. Slack*, 629 S.W.3d 735, 739 (Tex. App.—San Antonio 2021, no pet.) ("We measure the length of delay from (1) the time the accused is arrested or charged to (2) the time of trial or the defendant's demand for a speedy trial."). This factor is to some extent a "triggering

10

mechanism," *Shaw*, 117 S.W.3d at 889, which requires that a defendant make a "threshold showing that the interval between accusation and trial is 'presumptively prejudicial'" to necessitate that a court consider the remaining factors and weigh them, *Balderas*, 517 S.W.3d at 767. Presumptive prejudice is simply the burden to trigger a full inquiry; it "does not necessarily indicate a statistical probability of prejudice." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). Generally, delay approaching one year is sufficient. *Id.*; *cf. Cantu*, 253 S.W.3d at 281 ("[W]e have held that a delay of four months is not sufficient while a seventeen-month delay is.").

Appellee was indicted in these cases on February 1, 2018, and September 6, 2018. The hearing on his motion to dismiss was held on December 15, 2023. Accordingly, the lengths of delay in the cases were almost six years and five-and-a-half years, respectively. Such lengths are presumptively prejudicial and necessitate consideration of the remaining factors. This factor weighs heavily in favor of Appellee. *See Barker*, 407 U.S. at 533 (describing delay of "well over five years" as "extraordinary"); *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) (declaring that delay of three-and-a-half years "stretched far beyond the minimum needed to trigger the enquiry" and "weighs heavily in favor of finding a violation of the speedy trial right").

### B.     Reason for Delay

The Supreme Court in *Barker* listed three categories of delay that a reviewing court must weigh when conducting a speedy-trial analysis and explained the weight that should be given to each category. *See* 407 U.S. at 531. First, a deliberate attempt to "hamper the defense" weighs heavily against the State. *Id.*; *Balderas*, 517 S.W.3d at 768. Second, neutral reasons, "such as negligence or overcrowded courts," weigh less heavily but must still be considered "since the ultimate responsibility for such circumstances must rest with the government rather than with the

11

defendant." *Barker*, 407 U.S. at 531. Finally, valid reasons, such as a missing witness, "should serve to justify appropriate delay," *id.*, and do not weigh against the State, *Munoz*, 991 S.W.3d at 822. Additionally, delay caused by the defendant or his counsel weighs against the defendant. *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017) (citing *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)); *Balderas*, 517 S.W.3d at 768. If the record does not provide a reason for a delay, a court may not presume that the delay was due to a valid reason or to the State's bad faith. *Dragoo*, 96 S.W.3d at 314.

We agree with the trial court's finding that the delay in these cases was caused almost entirely by the State's official negligence and inaction. The State is certainly correct that "an accused cannot sustain a speedy-trial claim when delay results from his being a fugitive from justice," *Dickey v. Florida*, 398 U.S. 30, 48 (1970) (Brennan, J., concurring), and that when an accused goes into hiding, the State's diligent efforts to track him down do not count against it, *see Doggett*, 505 U.S. at 656. However, the record does not support the State's conclusion that Appellee spent the nearly six years between his first indictment and arrest evading detection and thwarting attempts at discovery.

Rather, the evidence from the hearing showed that Appellee resided during the period of delay at two addresses: his own residence and his mother's residence, into which he moved around 2021. Officers were aware of both addresses, which were listed on Appellee's booking sheets, registered in county property records, and documented in Appellee's parole file. As of at least February 8, 2018, law enforcement was likewise in possession of Appellee's purported phone number, but there was evidence of only one attempt to call it. During the period of delay, Appellee worked as a self-employed construction worker and managed multiple properties on the same street on which he lived. Officers visited Appellee's residence on multiple

12

occasions. Indeed, on one such occasion on July 7, 2018—five months after Appellee was first indicted—officers believed Appellee to be inside the residence while they knocked and shouted but left without making contact.

Largely absent from the record is evidence that the State took affirmative steps to inform Appellee of the charges or to execute the arrest warrants. "[A]lthough an accused is entitled to a speedy trial, a defendant has no duty to bring himself to trial." *Gonzales v. State*, 435 S.W.3d 801, 811 (Tex. Crim. App. 2014). There was no evidence as to what officers shouted on July 7th, much less evidence that Appellee heard them. Not only were the officers at the residence for an incident not charged in these cases, but a defendant's knowledge that police are investigating a possible crime is insufficient to prove his knowledge of outstanding charges or to put him "on notice to assert his right to speedy trial." *See id.* at 812. While an article published in 2018 included Appellee among Tom Green County's "Most Wanted," he testified that he did not see the article, and no evidence contradicted his testimony. And although his parole records included a notation that he was declared an absconder in November 2017, there was no evidence that he was aware of having been labeled as such or that the State attempted to apprehend him for absconding. Indeed, the hold was withdrawn by the time of his arrest, and he testified that he believed he had successfully completed his parole in 2017. Even if, as the State argues, Appellee should have been "constructively aware that he was a wanted man," that knowledge did not excuse the State from acting to bring him to trial. *See Doggett*, 505 U.S. at 656; *Gonzales*, 435 S.W.3d at 811.

The only evidence of an attempt to execute an arrest warrant for Appellee came from the testimony of Detective Covey, who in January 2020 went to Appellee's mother's house. Visits to Appellee's residence, on the other hand, were ambiguous. Appellee testified that he rented

13

the property, and Officer Kvittem testified that officers responded to the address at least once for a reason unrelated to Appellee. Moreover, some witnesses testified that reasons other than the execution of a warrant could have resulted in calls to the address. Though Marshal Rich testified that he had gone to 1402 E. 18th Street in 2019 "for court warrants," he did not know who he was looking for or who lived at the address.

As noted above, the State bore the burden of justifying the delay in these cases. *Davis*, 549 S.W.3d at 697. The record, viewed in the light most favorable to the trial court's ruling, supports its finding that the delay resulted from the State's inaction and negligence and not from efforts to track down a defendant who had gone into hiding. *See Rivera v. State*, 990 S.W.2d 882, 892–93 (Tex. App.—Austin 1999, pet. ref'd) (contrasting cases where "the defendant actively avoided apprehension" with cases in which "the State could have located the defendant with reasonable effort"). Although negligence occupies the middle ground between bad-faith and valid delay, "it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Doggett*, 549 S.W.3d at 657. Moreover, "such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness and its consequent threat to the fairness of the accused's trial." *Id.* The State's negligence carries even more weight because it knew of addresses and a phone number associated with Appellee but failed diligently to pursue those means of contacting him. *See Gonzales*, 435 S.W.3d at 810. "[P]ersistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it." *Doggett*, 549 S.W.3d at 657. The right to a speedy trial is "too important to sanction neglect, even if

14

nonwilful." *Phillips v. State*, 650 S.W.2d 396, 400 (Tex. Crim. App. 1983). Accordingly, this factor weighs in favor of Appellee.

### C. Assertion of Right

The defendant's assertion of his right to a speedy trial is entitled to strong evidentiary weight in determining whether that right has been denied. *See Balderas*, 517 S.W.3d at 771 (citing *Gonzales*, 435 S.W.3d at 810–11); *Davis*, 549 S.W.3d at 704. A speedy-trial demand should be unambiguous. *Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013). When a defendant does not timely demand a speedy trial, it "indicates strongly that he did not really want one." *Balderas*, 517 S.W.3d at 771. Repeated requests for a speedy trial weigh heavily in favor of a defendant, "while the failure to make such requests supports an inference that the defendant does not really want a trial, he wants only a dismissal." *Cantu*, 253 S.W.3d at 283. Moreover, although filing for dismissal of the charges instead of a speedy trial does not necessarily waive a speedy-trial claim, *see Davis*, 549 S.W.3d at 704, doing so "will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one," *Cantu*, 253 S.W.3d at 283.

Nevertheless, "[i]n some cases, defense counsel may legitimately feel that a long delay has caused a client so much prejudice that dismissal is warranted, even if the State is belatedly ready to move promptly." *Phillips*, 650 S.W.2d at 401. Where a defendant seeks dismissal before seeking a speedy trial, he "should provide cogent reasons" for doing so. *Cantu*, 253 S.W.3d at 283.

Because Appellee was not aware of the charges until March 23, 2023, we look only to the period after that date. *See Phillips*, 650 S.W.2d at 400 ("Obviously, appellant cannot be faulted for failing to assert a right he did not know he was entitled to."). Counsel was appointed

15

for Appellee on June 1, 2023. A week later, in a discovery request, counsel first asserted appellant's speedy-trial right: "Defendant further asserts HIS/HER right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution, Article I, § 10 of the Texas Constitution and Article 1.05 of the Texas Code of Criminal Procedure." The assertion was unambiguous, and we do not agree with the State that it was weakened to the extent that it was "*pro forma*." Five months later, appellant filed his motion to dismiss. In the motion, counsel noted that Ibarra, "a material witness to the offense[s]," had died on March 3, 2023. "Regardless of whether defense counsel thought this fact was enough to move for dismissal, rather than for a speedy trial," we see nothing to suggest that Appellee "deliberately failed to move for a speedy trial because of tactical reasons." *See id.* at 401.

Under these circumstances, we conclude that Appellee timely asserted his right to a speedy trial. *See Doggett*, 505 U.S. at 653 (stating that defendant's timely assertion of his right to speedy trial turns, in large part, on whether he knew about outstanding charges); *see also United States v. Cardona*, 302 F.3d 494, 498 (5th Cir. 2002) (concluding that when there is no evidence that defendant knew about charges until his arrest, but he timely asserted his right to speedy trial after his arrest, assertion-of-right factor weighs in defendant's favor). This factor weighs in Appellee's favor. *See Gonzales*, 435 S.W.3d at 812; *Phillips*, 650 S.W.2d at 401.

### D.      Prejudice

The same length of delay that heightens Appellee's burden to show that he timely asserted his right lessens his burden to show prejudice. *See Cantu*, 253 S.W.3d at 280–81. The United States Supreme Court has identified three interests of the defendant that the speedy-trial right was meant to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety

16

and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532. The most serious is the last, including the unavailability of witnesses or loss of memory, because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

Because Appellee spent no time in jail before his arrest, posted bond the day after, and was unaware of the charges against him, our sole concern is with the third interest. *See id.*; *Gonzales*, 435 S.W.3d at 812. The State's negligence resulted in a more-than-five-year delay in bringing these cases to trial. This is the kind of excessive negligent delay that compounds presumptive prejudice by its length and for which a defendant is excused from showing "specific prejudice" to his defense because it "presumptively compromises the reliability of a trial in ways that neither party can prove or even identify." *See Gonzales*, 435 S.W.3d at 810; *Shaw*, 117 S.W.3d at 890; *Munoz*, 991 S.W.2d at 822. The risk of prejudice is all the greater because Appellee did not know about the charges during the period of delay. *See Phillips*, 650 S.W.2d at 402 ("If there is always the danger that witnesses will disappear or memories fade, how much greater is that danger where, because he does not know he is accused, a prisoner can take no action to thwart the impact of time?"). The United States Supreme Court has explained with respect to a similar period of negligent delay that "when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief." *Doggett*, 505 U.S. at 658.

Yet Appellee has in fact identified specific prejudice. First, as was made plain from officers' testimony during the speedy-trial hearing, memories have substantially degraded in the more than seven years since the offenses were allegedly committed. Second, Ibarra, who Appellee testified was present for both alleged offenses and would have been able to testify on his behalf,

17

has died. "If witnesses die or disappear during a delay, the prejudice is obvious." *Barker*, 407 U.S. at 532. The State's argument that the substance of Ibarra's testimony is unknown and might have been inculpatory is beside the point. *Barker* does not require that a defendant show a missing witness would have testified favorably for the defense but only that the witness was a "material" witness "in the sense that he was believed to know about the facts of the offense." *Phillips*, 650 S.W.2d at 402–03; *see Webb v. State*, 36 S.W.3d 164, 174–75 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) ("Because prejudice is obvious when witnesses die or disappear during a delay, a defendant need only show that the prospective witness was believed to be material to the case, not that the witness would have testified favorably to the defense."). The prejudice is not merely to the substance of Appellee's defense but to his ability to prepare a defense in the first place; "we will never know whether [the witness] would have testified for appellant, or testified at all, but appellant never had the chance to find out." *See Phillips*, 650 S.W.2d at 402.

We therefore conclude that under the facts of this case, the State failed to rebut the presumption of prejudice, and Appellee has made a showing of actual prejudice. This factor weighs heavily in favor Appellee.

### E.     Summary

All four of the *Barker* factors weigh in favor of Appellee's speedy-trial claim, two of them heavily. Although dismissal of charges "is a radical remedy" and not one that we take lightly, we conclude that the State violated Appellee's Sixth Amendment right to a speedy trial. *See Cantu*, 253 S.W.3d at 281. Dismissal of the indictments with prejudice was, consequently, mandatory. *See Cantu id.* We overrule the State's first issue.

18

## II.    Judicial Notice

In its second issue, the State contends that the trial court erred by improperly judicially noticing a subscription requirement to access the "Most Wanted" article on the webpage of the San Angelo Standard-Times—a requirement, moreover, that the State argues was erroneous. *See* Tex. R. Evid. 201(b)(2) (allowing court to judicially notice fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Appellee correctly responds that the issue was not preserved.

To preserve a complaint for appellate review, there must ordinarily be a timely, specific objection and a ruling by the trial court. Tex. R. App. P. 33.1(a). "To be timely, a complaint must be made as soon as the grounds for complaint [are] apparent or should be apparent." *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999). To be sufficiently specific, an objection need not employ "hypertechnical or formalistic . . . words or phrases," *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018); "magic words," *Ford*, 305 S.W.3d at 533; or a citation to a particular statute, *Laws v. State*, 640 S.W.3d 227, 229 (Tex. Crim. App. 2022) (quoting *Ford*, 305 S.W.3d at 533). Rather, the objecting party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *see Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). "This gives the trial judge and the opposing party an opportunity to correct the error." *Pena*, 285 S.W.3d at 464 (citing *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005)).

The State argues that the trial court did not offer it the "opportunity to be heard" because the court only disclosed the finding after deciding how it would rule on the motion to dismiss. The court made the finding orally at the conclusion of the hearing, explaining,

19

> I'm going to tell you what would be my findings of fact . . . . There is no explanation for the delay other than the State asserts that the defendant perhaps should have known that he was charged because there was an article in the GoSanAngelo, which requires a subscription for someone to be able to read to know about that. There's no evidence that the defendant had a subscription to that document.

Notably, this finding was not included in the court's subsequent written findings of fact.

Rule 33.1 "requires objection as soon as the error is apparent or should be apparent, not when the error becomes *more apparent*." *Hollins v. State*, 805 S.W.2d 475, 477 (Tex. Crim. App. 1991). We find the decision of our sister court in *Crayton v. State* instructive. *See* 485 S.W.3d 488, 497 (Tex. App.—Texarkana 2016, no pet.). Crayton took issue with the trial court's judicially noticing his competency evaluation while the court was outside of the parties' presence and during its private deliberations. *See id.* at 495. "In other words, the trial court had already taken judicial notice of the file and the report before Crayton had an opportunity to object." *Id.* The trial court disclosed that it had judicially noticed the evaluation in a statement to the parties explaining its reasoning. *Id.* at 496. Our sister court concluded:

> [F]rom soon after the trial court began its explanation of its decision until the end of the proceedings, Crayton was aware that the trial court had reviewed the competency report. At no point during this did Crayton raise any objection to the trial court's reference to the psychiatrist's opinion concerning Crayton's competency. Crayton cannot now contend that he was "unable to object" because the trial court drew its conclusions in private. The trial court announced to the parties mid-way through issuing its verdict that it had taken judicial notice of the file and, specifically, that the court had "looked at" the competency report. Although Crayton had ample time during the trial court's soliloquy to lodge an objection, he failed to make a timely objection as soon as it became apparent that the trial court was taking judicial notice of the file or had "looked at" the competency report; thus, he failed to preserve the alleged error for our review.

*Id.* at 497.

Here, the hearing transcript went on for two-and-a-half pages after the trial court made its oral finding regarding the article. At no point after learning of the finding did the State object, despite the opportunity to do so. Because the State did not object to the trial court's finding or to its judicially noticing a subscription requirement, any error was not preserved for appellate review. *See* Tex. R. App. P. 33.1(a); *Bailey v. State*, 713 S.W.2d 791, 793 (Tex. App.—San Antonio 1986, pet. ref'd) (without proper objection to trial court's taking judicial notice, nothing is presented for review). We overrule the State's second issue.

## CONCLUSION

Having overruled both of the State's issues, we affirm the trial court's order dismissing the prosecutions.

_____

Maggie Ellis, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed

Filed: December 10, 2025

Do Not Publish